## LINGER v. BALFOUR.

(Court of Civil Appeals of Texas. Amarillo.
March 30, 1912. Rehearing Denied
May 11, 1912.)

1. ELECTIONS (§ 293*)—CONTESTS—EVIDENCE
—QUALIFICATIONS OF VOTER.

On an issue in an election contest as to the residence of an unmarried voter whose right to vote was denied, it was not error to reject testimony as to whether the voter resided with a particular family during a specified time, as to where his home had been since his removal from another county, and as to whether he ever claimed any other home since he took up his headquarters in the county of the contest; the residence of a single man, under the statute, for purpose of voting, being the place where he usually sleeps, and the testimony offered not tending to throw light on that question.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 288–296; Dec. Dig. § 293.*]

2. APPEAL AND ERROR (§ 1056*) — REVIEW — HARMLESS ERROR—EVIDENCE.

An election contestant is not entitled to complain on appeal of a ruling rejecting testimony offered to show the qualifications of a particular voter, where the trial court sustained his qualifications.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4187–4193; Dec. Dig. § 1056.*]

3. ELECTIONS (§ 293*) — EVIDENCE (§ 471*) — CONTESTS — ADMISSIBILITY OF EVIDENCE — CONCLUSION OF WITNESS.

On an issue in an election contest as to whether a particular voter resided in the state on January 1st, so as to make him liable for poll tax, it was error to exclude his testimony that he and his wife did nothing toward establishing a home in the state until about the middle of January; such testimony being relevant, and not being objectionable as a conclusion of the witness.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 288–296; Dec. Dig. § 293;* Evidence, Cent. Dig. §§ 2149–2185; Dec. Dig. § 471.*]

4. ELECTIONS (§ 293*) — EVIDENCE (§ 471*) — CONTESTS—OPINION EVIDENCE — RELEVANCY.

On an issue in an election contest as to the residence of an unmarried voter whose right to vote was denied, testimony as to where he had lived since a specified time, where his headquarters were during that time, and as to where he considered his home to be since that time, was properly excluded as calling for a conclusion of mixed questions of law and fact, and as irrelevant to the issue as to the voting residence of a single man.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 288–296; Dec. Dig. § 293;* Evidence, Cent. Dig. §§ 2149–2185; Dec. Dig. § 471.*]

5. EVIDENCE (§§ 471, 472*)—CONCLUSION OF WITNESS — MIXED QUESTION OF LAW AND FACT.

On an issue in an election contest as to the residence of a voter whose right to vote was denied, testimony that a certain house was his home since a specified date was properly excluded as involving mixed questions of law and fact, and as being a conclusion of the witness.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2149–2185, 2186–2195; Dec. Dig. §§ 471, 472.*]

6. ELECTIONS (§ 293*)—CONTESTS—EVIDENCE —ADMISSIBILITY.

On an issue in an election contest as to the residence of a voter whose right to vote was denied, testimony that he did not go on a claim, which he had filed on in another state, to live was properly excluded, since, he being a single man, his right to vote was fixed by statute at the place where he usually slept.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 288–296; Dec. Dig. § 293.*]

7. EVIDENCE (§ 144*) — ADMISSIBILITY — MATERIALITY—CERTAINTY.

On an issue in an election contest as to the residence of a voter whose right to vote was denied, testimony as to whether witness ever heard the voter or his wife say where they resided before they came to live with witness, and if they said they had resided in another state, and how long they had resided there, was properly excluded as being indefinite and vague.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 430–433; Dec. Dig. § 144.*]

8. ELECTIONS (§ 293*)—CONTESTS—EVIDENCE —ADMISSIBILITY.

On an issue in a contest under an election held November 8, 1910, as to the residence of a voter whose right to vote was denied, testimony that the voter lived in a certain town from June 10th until November 8th was properly excluded.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 288–296; Dec. Dig. § 293.*]

9. EVIDENCE (§ 471*)—CONCLUSION OF WITNESS.

On an issue in an election contest as to the residence of a voter whose right to vote was denied, testimony that witness had lived at a specified place during a certain period, and was acquainted with the voter, but had not seen him at that place during that period, and that if the voter had been there witness would have seen him, was properly excluded as being a conclusion of the witness.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2149–2185; Dec. Dig. § 471.*]

10. APPEAL AND ERROR (§ 1056*)—HARMLESS ERROR—EXCLUSION OF TESTIMONY.

Any error in excluding testimony as to the qualifications of a voter whose right to vote was denied by contestant was harmless to contestant, where it is found that the voter was disqualified and his vote illegal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4187–4193; Dec. Dig. § 1056.*]

11. EVIDENCE (§ 320*)—HEARSAY TESTIMONY —ELECTION CONTEST.

On an issue in an election contest as to the qualifications of a voter, testimony relating to the voter's residence was properly excluded, where it appeared that it was based on hearsay.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1201; Dec. Dig. § 320.*]

12. ELECTIONS (§ 60*)—ALIENAGE—NATURALIZATION—TIME FOR APPLICATION.

Naturalization Act (Act Cong. June 29, 1906, c. 3592, 34 Stat. 596 [U. S. Comp. St. Supp. 1911, p. 529]) § 4, subd. 2, which provides that petitions for naturalization shall be made not more than seven years after declaration of intention, does not apply to aliens who declared their intention before the law was enacted; and hence a resident of Texas was not disqualified to vote on the ground of alienage, where he had declared his intention to become a citizen August 29, 1888, and his application for final adjudication was pending—he having paid his poll tax regularly, and having resided

in the state, county, and precinct for the required time.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 56; Dec. Dig. § 60.*]

13. ELECTIONS (§ 83*)—ELECTORS — QUALIFICATIONS—AGE.

A citizen, who became of age June 29, 1909, was disqualified to vote at an election held November 8, 1910, where he failed to appear before the tax collector before February 1, 1910, to make the affidavit and secure the certificate of exemption required by Terrell Election Law (Acts 29th Leg. Ex. Sess. c. 11) § 23, though he paid the poll tax after the year 1910, to which he was not subject, and which had not been assessed against him.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 77–81; Dec. Dig. § 83.*]

14. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE —SUFFICIENCY.

On an issue in an election contest as to the qualification of a voter, evidence held to sustain a finding that he was a resident of the county in which he voted.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297–299; Dec. Dig. § 295.*]

15. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE —SUFFICIENCY.

On an issue in an election contest as to the qualification of an unmarried voter, evidence held to show that he usually slept in a county other than where he voted, precluding his right to vote.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

16. ELECTIONS (§ 83*)—ELECTORS—QUALIFICATIONS.

A person, who became of age July 20, 1909, was disqualified to vote November 8, 1910, where he failed to make affidavit and secure a certificate of exemption from poll tax, as required by Terrell Election Law (Acts 29th Leg. Ex. Sess. c. 11) § 23.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 77–81; Dec. Dig. § 83.*]

17. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE —QUALIFICATION OF ELECTOR.

In an election contest, evidence held to show that a voter did not reside in the county during the six months next preceding the election, invalidating his vote.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

18. ELECTIONS (§ 72*)—ELECTORS—QUALIFICATIONS—RESIDENCE.

A married man, who had resided in the state, county, and voting precinct for the required period, was qualified to vote, though his family, from whom he was separated, lived in another state; it appearing that he had been permanently separated from his wife for more than a year preceding the election.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 67, 68, 70; Dec. Dig. § 72.*]

19. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE —RESIDENCE OF ELECTOR.

In an election contest, evidence held to show that a voter did not reside in the county, invalidating his vote.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

20. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE —RESIDENCE OF ELECTOR.

In an election contest, evidence held to sustain a finding that a voter resided in the county, and hence was qualified to vote.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

21. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE —RESIDENCE OF ELECTOR.

Evidence in an election contest held to show that a voter was not a resident of the county, and that his vote was illegal.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

22. ELECTIONS (§ 83*)—ELECTORS — QUALIFICATIONS.

A person, who became of age June 11, 1909, was disqualified to vote November 8, 1910, where he did not make affidavit and secure the certificate of exemption from poll tax, required by Terrell Election Law (Acts 29th Leg. Ex. Sess. c. 11) § 23.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 77–81; Dec. Dig. § 83.*]

23. ELECTIONS (§ 72*)—ELECTORS — QUALIFICATIONS—PAYMENT OF POLL TAX.

Under Terrell Election Law (Acts 29th Leg. Ex. Sess. c. 11) § 22, which provides that a citizen, who removes to another county or to another precinct after he has received his poll tax receipt or certificate of exemption, may vote in the new precinct by presenting the receipt or certificate, and by making oath that he resides in the precinct and has resided in the district or county for 6 months and in the state for 12 months, no particular length of residence is required in the new precinct, where the voter moves from one precinct to another in the same county.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 67, 68, 70; Dec. Dig. § 72.*]

24. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE —RESIDENCE OF ELECTOR.

Evidence in an election contest held to show that a voter was not a resident of the county, and that his vote was illegal.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

25. ELECTIONS (§ 72*)—ELECTORS—QUALIFICATIONS—RESIDENCE.

Under Terrell Election Law (Acts 29th Leg. Ex. Sess. c. 11) § 4, if an unmarried man has a room or habitation to which he usually returns, and where he usually sleeps at such times when he is not actively engaged in work elsewhere, his voting residence is in the precinct where such room or habitation is located.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 67, 68, 70; Dec. Dig. § 72.*]

26. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE —RESIDENCE OF VOTER.

In an election contest, evidence held to sustain a finding that a voter had resided in the county for six months next preceding the election.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

27. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE —RESIDENCE OF ELECTOR.

Evidence in an election contest held to show that a voter was not a resident of the county, and that hence his vote was illegal.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

28. APPEAL AND ERROR (§ 882*)—REVIEW— RIGHT TO COMPLAIN.

An election contestant is not entitled to complain on appeal that a particular vote should have been counted, where he requested a finding that the vote was illegal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3591–3610; Dec. Dig. § 882.*]

29. ELECTIONS (§ 72*)—ELECTORS — QUALIFICATIONS—RESIDENCE.

That an unmarried university student during a vacation went to a particular town and

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

declared his intention of becoming a resident thereof, and went from the university to that place to vote, sufficiently shows that he resided therein, rendering his vote legal.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 67, 68, 70; Dec. Dig. § 72.*]

30. ELECTIONS (§ 83*)—ELECTORS—QUALIFICATIONS—PAYMENT OF POLL TAX.

A resident was disqualified to vote at a general election November 8, 1910, where he failed to pay the poll tax for 1909 in the county of his former residence; he not having left there until March, 1909, though he paid the poll tax in the county where he voted—it being a voluntary payment, not due.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 77–81; Dec. Dig. § 83.*]

31. ELECTIONS (§ 83*)—ELECTORS—QUALIFICATIONS.

A person was disqualified to vote at a general election November 8, 1910, where he resided in another county January 1, 1909, was subject to the payment of a poll tax to that county for that year, which he did not pay, and where he did not reside in the particular county, in good faith, for six months next preceding the election.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 77–81; Dec. Dig. § 83.*]

32. ELECTIONS (§ 83*)—ELECTORS — QUALIFICATIONS—PAYMENT OF POLL TAX.

Persons were disqualified to vote at a general election November 8, 1910, where they owed poll taxes to another county and resided in such county on January 1, 1909, and did not pay the same before February 1, 1910.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 77–81; Dec. Dig. § 83.*]

33. ELECTIONS (§ 83*)—ELECTORS—QUALIFICATIONS—PAYMENT OF POLL TAX.

A person was disqualified as an elector at a general election, where he was delinquent in the payment of a state poll tax.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 77–81; Dec. Dig. § 83.*]

34. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE—PAYMENT OF POLL TAX.

Evidence, in a contest under a general election held November 8, 1910, held to sustain a finding of delinquency in the payment of a poll tax for the preceding year, invalidating a vote.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

35. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE—RESIDENCE OF ELECTOR.

Evidence in an election contest held to show that a voter was not a resident of the county, and that hence his vote was illegal.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

36. ELECTIONS (§ 83*)—ELECTORS—QUALIFICATIONS—PAYMENT OF POLL TAX.

The unauthorized payment of another's poll tax by a volunteer with the latter's own money does not authorize the former to vote.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 77–81; Dec. Dig. § 83.*]

37. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE—RESIDENCE OF VOTER.

In an election contest, evidence held to sustain a finding that a voter had not resided in the state for 12 months next preceding the election, thus invalidating his vote.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

38. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE—RESIDENCE OF VOTER.

In an election contest, evidence held to sustain a finding that a voter had been a resident of the state for the required time.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

39. ELECTIONS (§ 295*)—CONTESTS—EVIDENCE—RESIDENCE OF VOTER.

In an election contest, evidence held to sustain a finding that absence of certain voters from their residence established in the county was temporary, rendering their votes valid.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

40. ELECTIONS (§ 291*)—CONTESTS—QUALIFICATION OF VOTER—BURDEN OF PROOF.

In an election contest, the burden was on the party, who complained of a finding that a certain person was a legal voter, to show that the voter was legally subject to a municipal poll tax, and had failed to pay it.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 286; Dec. Dig. § 291.*]

41. ELECTIONS (§ 83*)—ELECTORS — QUALIFICATIONS—PAYMENT OF POLL TAX.

A person was disqualified as an elector at the general election held November 8, 1910, where he failed to pay a poll tax due from him in another county for the preceding year, though he paid the tax in the county where he voted; he not being subject thereto.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 77–81; Dec. Dig. § 83.*]

42. ELECTIONS (§ 291*)—CONTESTS—BURDEN OF PROOF—QUALIFICATION OF VOTER.

In an election contest, the burden was on the party who complained that a person was not entitled to vote, though a militiaman, to show that the voter was not exempt from the payment of a city poll tax.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 286; Dec. Dig. § 291.*]

43. ELECTIONS (§ 295*)—RETURNS—VALIDITY.

The returns from an election precinct should not be disregarded in an election contest on the ground of any fraudulent conspiracy to carry the election, where it does not appear that the conspiracy was executed, if any existed, or that any fraudulent acts influenced any illegal voting.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 297, 299; Dec. Dig. § 295.*]

Appeal from District Court, Oldham County; D. B. Hill, Judge.

Election contest by A. F. Linger against William Balfour. Judgment for contestee, and contestant appeals. Reversed and rendered.

Madden, Trulove & Kimbrough, F. M. Ryburn, and H. C. Pipkin, all of Amarillo, for appellant. Gustavus, Bowman & Jackson, Cooper, Merrill & Lumpkin, and C. B. Reeder, all of Amarillo, for appellee.

PRESLER, J. This is an election contest, in which appellant, Linger, contests the right of appellee, Balfour, to hold the offices of county and district clerk of Oldham county, as a result of the general election held November 8, 1910. A trial resulted in a judgment, rendered August 18, 1911, in favor of contestee, and contestant duly appeals from

said judgment and here seeks to have the same reversed and rendered in his favor. The issues involved in this contest and the evidence bearing on the same will sufficiently appear in this opinion, as the respective issues raised are separately considered and disposed of.

[1, 2] Contestant, by his first assignment of error, complains of the action of the court in rejecting certain testimony offered by contestant in support of the right of John Landergin to vote, which evidence was, upon objection by contestee, by the court excluded. The testimony objected to was as follows: "Q. State whether or not you were residing with the family of Pat Landergin during the time of this leasehold [referring to the lease of the residence in Wichita]. A. I might not have been a resident here the whole time. I was in St. Louis when he moved from Kansas here. Q. Where has been your home since that removal was made from Greenwood county? A. It has been out here ever since I came down. I did not come down when the furniture came down. I came down a little over a year after that time. Q. State whether or not you have any other home, or ever claimed any other home since you took up your headquarters in Oldham county, except the ranch headquarters here in Oldham county. A. No, sir." The objection made was that they embodied a conclusion as to a mixed question of law and fact. We are of the opinion that the assignment is without merit, in that the test of a single man's right to vote, as prescribed by the statute, is fixed with reference to the place where he usually sleeps; and we are unable to see what bearing the questions propounded, or the answers thereto, had upon the determination of this question, and think the court properly sustained the objection to the same. We are further of the opinion that the matter complained of in this assignment becomes immaterial in view of the fact that the right of John Landergin to vote was sustained by the trial court. Savage v. Umphries, 118 S. W. 893.

We also conclude that contestant's second and third assignments are without merit, and should be overruled upon the same ground and for the same reason and authority given in overruling the first assignment.

[3] Contestant, by his fourth assignment, as corrected in his supplemental brief, complains of the action of the court in excluding, on objection of contestee, the testimony of J. T. Owen, to the effect that he and his wife had not done anything, prior to January 1, 1909, toward establishing a home in Texas, and did not do anything until about the middle of January, 1909. We are of the opinion that this assignment is well taken, and that upon the issue joined as to whether this voter, who had removed from Missouri to Texas, was residing in Texas on the 1st day of January, 1909, so as to make him owe to the state and county of his residence in Texas a poll tax for that year; that it was material and competent to ask and have him state that he had not, prior to about January 15, 1909, done anything toward establishing a home in Texas; and that such testimony is not such conclusion of the witness as renders the same objectionable.

[4] Contestant, by his fifth assignment, complains of the action of the court in excluding the testimony of the witness Matkin, as to where he had been living since March, 1907, where his headquarters were during said period, and as to where he considered his home since March, 1907. The objection of contestee to this testimony was that the same called for and gave the conclusion of the witness on mixed questions of law and fact and on irrelevant matters. We are of the opinion that the objections were well taken. The law prescribes that the residence of a single man is where he usually sleeps; and we are unable to see that these questions and answers had any relevancy to this issue. An unmarried man may room and sleep in one ward of a city, may take his meals in another ward, and his occupation and business require him to spend all of the balance of his time in still a third ward. Matkin was a cowboy, working for Jackson Bros., whose principal headquarters were at Vega. They had a ranch in Oldham county, and also one in Deaf Smith county. Suppose he worked indiscriminately upon both ranches, and was at headquarters only when he was not at work, and when out on the range he usually slept with the outfit, and the outfit might be in either Oldham or Deaf Smith counties, according as the territory which was being worked required. This man's home may have been in a distant state. These conditions illustrate the wisdom of the Legislature in definitely fixing the residence of an unmarried man to be the place where he usually sleeps; and, as none of the questions propounded threw any light upon that issue, we think the court did not err.

We are of the opinion that the evidence referred to in contestant's sixth and seventh assignments, and which the court refused to admit, was hearsay, and that there was no error in the action of the court complained of. Said assignments are therefore overruled.

[5] Contestant, under his eighth assignment, complains of the action of the court in rejecting the following questions and answers propounded to the witness Morgan: "Q. Is that [referring to the house he had been living in with his wife and furniture in Vega] your home? A. Yes. Q. Have you had any other home except Vega, Texas, since the 22d day of July, 1909? A. No, sir." To which questions and answers contestee objected, because the same involved mixed questions of law and fact, and called for a conclusion of the witness. We think the objection was

well taken, and the court did not err in excluding the testimony.

[6] Contestant, under his ninth assignment, complains that the court erred in excluding, on objection of contestee, the testimony of Roy Harrell, to the effect that he did not go on a claim, which he had filed on in New Mexico, to live, offered in rebuttal to contestee's testimony that he filed on a claim in New Mexico. It appearing from the record that the voter in question, Roy Harrell, was a single man, and that his right to vote is fixed by the statute at the place where he usually sleeps, it does not occur to us that the question as to whether he had either filed on a claim in New Mexico, or as to whether he ever went on the claim to live, is material and relevant to the issue of his right to vote in Oldham county. Proof that he had filed on a claim in New Mexico October 1, 1909, does not establish or tend to establish, under the state of this record, the fact that such filing had destroyed his citizenship in Texas. We think the court properly rejected the evidence offered by contestant, and should also have rejected that offered by contestee, if objection had been made to the same. There is no merit in the assignment, and the same is accordingly overruled.

[7] Under contestant's tenth assignment, he complains of the following matter: This question was propounded to the witness Mrs. Neal: "Please state whether or not you have heard either Mr. Collier or his wife say, prior to November 8, 1910, where they resided before they came to you, and if you have heard them say that they resided in Roswell, New Mexico. Please state if they have told you how long they resided there, and when they left Roswell, New Mexico, to come to Texas. A. I think I have heard them state that they had resided at or near Roswell, New Mexico. My impression is that they came from Roswell, New Mexico, here; but think Mr. Collier was in the state in the interest of the Adrian Company before he came to me, or his wife came to board with me. I do not know how long they resided in Roswell." Contestant complains of the exclusion of the above testimony, and we are of the opinion that the assignment is without merit, because the evidence, if admitted, is too indefinite and vague to have any probative force whatever upon any issue in this case.

[8] Contestant, under his eleventh assignment, complains that the court erred in excluding, on objection of contestee, the testimony of J. C. Elam, to the effect that J. C. Collier was living in Adrian from June 10 until November 8, 1910. We are of the opinion that the court properly excluded the testimony referred to.

[9] Under contestant's twelfth assignment, it appears that contestant had challenged the right of C. J. Collier to vote, alleging that he had not resided in Oldham county during the six months next preceding the election. C. J. Collier was a single man (school-teacher, engaged in teaching school in Amarillo and boarding in Amarillo, from about the 1st of September, 1910, up until the time of the trial). Tom Stock testified that he lived at Adrian during this period, and that he was acquainted with the voter and the people who lived in Adrian generally, and that he had not seen C. J. Collier there in Adrian from the spring of 1910 until the time of the election. In connection with this testimony, contestant offered to read the further question and answer: "Q. Could Mr. Collier have been in Adrian any length of time from the spring of 1910 to November 8, 1910, without your having seen him? A. No." To this testimony contestee objected, because it gave a conclusion of the witness. We think the objection was properly sustained, and that there was no error in excluding the evidence. The assignment is therefore overruled.

[10] In connection with the three foregoing assignments of error, bearing upon the right of C. J. Collier to vote, we deem it proper to state that, aside from the disposition made of said assignments under each severally, were the grounds alleged under said assignments sufficient to show error, same would be without injury and immaterial, in view of the conclusion of this court with reference to the voter C. J. Collier, formed upon consideration of the evidence admitted by the court; the finding of this court with reference to said voter being that he was an illegal voter, and his vote should not have been counted for contestee.

[11] Under contestant's thirteenth assignment, he complains of the admission of the following testimony: "Q. Mr. Noonan had some town property over by Mrs. McCarty's, didn't he? A. Yes, sir; I think he had some trunks there too. Q. You say you think he had some trunks and clothes there? A. I do not know what it was, further than some trunks there." Contestant objected to such questions and answers at the time the depositions were taken and at the time they were offered, because it appeared from the next succeeding question and answer that the witness did not know anything about the property of the voter Noonan, only from what Mrs. McCarty was telling him, and showed that he was testifying from hearsay, and not from his own knowledge of the facts. We think that the objection is well taken, and that the evidence complained of should have been excluded. We deem it proper to state here, as in passing on the preceding assignment, that this alleged error of the court here complained of becomes immaterial, in view of the finding of this court to the effect that the vote of Thomas Noonan was illegal, and should not have been counted.

[12] Contestant, under his sixteenth assignment, attacks the fifth finding of the trial court, on the ground that the same is but a conclusion of law, and on the ground that the court erred in holding that the following voters, who were shown to have voted for contestee, were legal voters, and insists that said votes were fraudulent and void, and should have been deducted from the total vote cast for contestee, to wit, William Balfour, Gordon Ridgeway, E. J. Grosjean, C. J. Collier, L. A. Berlin, C. E. Gist, H. C. Wollaston, Thomas Noonan, F. J. Riterspach, Ralph R. Deets, Sam Kible, Alexander Gurule, Roy Vivian, and R. R. Young, and under said assignment contends that the vote of contestee, William Balfour, was illegal, upon the ground that he was an alien and had not complied with the requirements of the federal laws governing the naturalization of foreigners, and was not a bona fide citizen of Texas and Oldham county, as required by state law. The facts with reference to this voter are: He was born in Scotland July 3, 1862, came to America in March, 1888, and went to Palo Alto county, Iowa; that on August 29, 1888, before the clerk of the district court of Palo Alto county, Iowa, he declared his intention of becoming a citizen of the United States; that he never at any time after making such declaration, and prior to the date of the election in question, took the necessary steps to become a bona fide citizen of the United States, but that his application for final adjudication is now pending in Potter county; that he has resided in Oldham county 15 years, paid his poll tax every year, and was residing in Tascosa precinct, in said county, where he voted. It further appears from the record in this case and contestant's brief that his objection to this voter, William Balfour, relates entirely to his alleged failure to comply with the federal naturalization laws, and to no other matter, contestant insisting, not only under this assignment, but under many others, that said Balfour was, at the time of said election, an unnaturalized alien, a subject of Great Britain, and because of such alleged legal status was not a legally qualified voter in this election; and, further, that he was ineligible to hold the office of county and district clerk of Oldham county, to which he was declared elected.

We are of the opinion that contestant's said objection to said voter upon the ground of his alleged alienage is without merit, and that this assignment, and all others based upon said contention of alienage, should be and the same are here overruled. We have examined the authorities cited by contestant in support of his contention as to the alienage of contestee, so far as the same are accessible to this court, and are of the opinion that said authorities do not support the said contention, or authorize this court to hold, under the facts and the law, that contestee, at the time of said election and now, was and is an alien. We find the declaration of intention to become a citizen, made by William Balfour, contestee, was in conformity with the law in force at the date of his making the same. The statute of the United States (Act of June 29, 1906, c. 3592, § 4, subd. 1, 34 Stat. 596 [U. S. Comp. St. Supp. 1911, p. 529]), amending the law with reference to naturalization of aliens theretofore in force, and prescribing the requisites of a declaration of intention, contains this proviso: "Provided, however, that no alien who in conformity with the law in force at the date of his declaration has declared his intention to become a citizen of the United States shall be required to renew such declaration." And further, in the second subdivision of said section, provides: "Not less than two years nor more than seven years after he has made such declaration of intention he shall make and file in duplicate a petition in writing signed by the applicant in his own handwriting and duly verified, in which petition such applicant shall state," etc. And it is insisted by contestant that the limitation of seven years in which to follow up said declaration of intention by an application in the proper court for full naturalization applies in this case to William Balfour; that he was foreign born, had not been naturalized, nor had he, within seven years prior to the time he voted, declared his intention of becoming a citizen of the United States in the manner and form as required by law; and that his legal status is that of an alien, not having declared an intention to become a citizen.

As before stated, we cannot concur in this contention. The only authority to which we have been cited by either contestant or contestee, or which we have been able to find, directly on this question, aside from the statute itself, is the opinion of the District Court of the United States for the Eastern District of Arkansas, in Re Wehrli (D. C.) 157 Fed. 938. In this case it appears that the petitioner, an alien, a native of Germany, filed his petition in said court on June 18, 1907, to be naturalized as a citizen of the United States, showing that his declaration of intention to become a citizen was filed in the circuit court of Logan county, state of Arkansas, on August 29, 1898, and the court says: "The act of Congress, June 29, 1906, c. 3592, 34 Stat. 596 (U. S. Comp. St. Supp. 1907, p. 419), provides: 'Not less than two years nor more than seven years after he has made such declaration of intention he shall make and file,' etc., his petition to be naturalized. As his declaration of intention to become a citizen of the United States had been made more than seven years prior to the petition for final naturalization, and, in fact, more than seven years prior to the enactment of the act by Congress, the question to be determined is wheth-

er this statute of seven years applies to such applicants. That this provision is in the nature of a statute of limitation is too clear for controversy and requires no citation of authorities, and, being such a statute, it is well settled by the decisions of all the courts, state as well as national, that, unless the language used is so clear, strong, and imperative that no other meaning can be given to it, or unless the intention of the Legislature cannot be otherwise satisfied, the statute ought not to be given retrospective construction. United States v. Heth, 3 Cranch, 413, 2 L. Ed. 479; Cooley on Constitutional Limitations, 455. This rule of construction applies especially to statutes of limitations, where the presumptions are all against any intention on the part of the legislative department to make the statute retroactive. 19 Am. & Eng. Enc. of Law (2d Ed.) 174." After quoting from the case of Lewis v. Lewis, 7 How. 776, 12 L. Ed. 909, and from the case of Sohn v. Waterson, 17 Wall. 596, 21 L. Ed. 737, in support of the rule above announced, the court continues by declaring that "any other rule would, in many instances, deprive persons of valuable rights without due process of law. No better illustration of this need be cited than the case at bar. The petitioner declares his intention to become a citizen in the state of Arkansas, where he resided; and when there was no limitation within which the final steps of naturalization were to be taken (as in the present case), an alien, who has declared such intention to become a citizen, is, under the Constitution of the state, entitled to all the rights of citizenship, including those of voting and holding office. Misled, perhaps, by these privileges, he neglected to become fully naturalized for more than seven years, when the present statute was enacted by Congress. If given retroactive effect, he was immediately upon the passage of the act cut off from ever becoming naturalized. * * * The true intent of Congress was that aliens declaring their intention to become naturalized after the passage of the act must file their application within seven years after the filing of the declaration of intention; and as to those who filed their declaration of intention before the enactment of the statute they must make their final application within seven years from the enactment of the act." We concur in the construction thus placed upon the federal statute in question, and, as stated before, here hold that upon the facts and the law the contestee, William Balfour, was a qualified elector and eligible to hold the office to which he was declared elected.

[13] Under contestant's sixteenth assignment, the legal right of Gordon Ridgeway to vote is challenged. This vote was cast and counted for contestee, and contestant contends that the same should have been deducted from contestee's total vote. It ap-

149 S.W.—51

pears from the evidence that this voter was a minor on the 1st day of January, 1909, and failed to appear before the tax collector of the county of his residence prior to the 1st day of February, 1910, and make proper affidavit and secure a certificate of exemption in the manner and form as required by section 23, Terrell Election Law (Acts 29th Leg. Ex. Sess. c. 11); that he became of age on the 29th day of June, 1909. It further appears from the evidence that this voter paid a poll tax after the year 1909 to which he was not subject, and which had not been assessed against him. We are unable to see that this voluntary payment of a poll tax to which he was not subject, and which was not required of him, clothed him with any right to vote. The requirement of the statute, as applied to him, was that he should make the proper affidavit and obtain a certificate of exemption. As he became of age on the 29th day of June, 1909, all that was necessary to clothe him with the right to vote was that he should have appeared before the tax collector not later than February 1, 1910, made the proper affidavit, and procured the certificate of exemption. Not having done this, we are of the opinion that contestant's assignment as to him is well taken, and that his vote is illegal and should not have been counted, and should be here deducted from the total vote allowed contestee.

[14] Contestant, under his sixteenth assignment and fourth proposition, contends that the court erred in holding E. G. Grosjean a qualified voter, and that said vote should have been deducted from the total vote cast, counted, and returned for contestee, and contends that this voter resided in the county of Potter and state of Texas on the 1st day of January, 1909, and owed said county and state a poll tax for the year 1909, which county tax he did not pay before the 1st day of February, 1910. The evidence shows that he paid his poll tax to Oldham county for that year and to the state of Texas; and, while the same is conflicting as to which county he was due a county poll tax, because of having been a resident of said county on January 1, 1909, we are of the opinion that it is sufficient to support the finding of the court to the effect that the poll tax was due to Oldham county, and that he was a legal voter at said election. We therefore conclude that there was no error in accepting his vote and counting the same for contestee. Contestant's said assignment is therefore overruled as to said voter E. G. Grosjean.

[15] Contestant, under his sixteenth assignment, challenges the right of C. J. Collier to vote, and contends that said vote should have been deducted from the total vote cast and counted for contestee. We are of the opinion that contestant's assignment as to this voter should be sustained,

on the grounds that he was not a resident of Oldham county for six months next preceding the election. The evidence shows with reference to him that he was a single man, a school-teacher by profession; that he resided in Hunt county, where he taught school, paid taxes, and voted prior to June, 1909; that after June, 1909, he came to the Panhandle, first coming to Amarillo, then going to Adrian, Oldham county; that he worked in and out of Adrian, traveling more or less, until September 5, 1910, having accepted employment in the city schools of Amarillo on September 5, 1910, when he began to board, eat, sleep, and room at Mrs. Neal's boarding house in Amarillo, where he continued to board, eat, and sleep until after the trial of this case. We think the evidence on the whole conclusively shows that from September 5, 1910, until the election, November 8, 1910, he usually slept at night in Amarillo, which fact, in our opinion precludes his having been a resident of Oldham county for six months next preceding the election. His vote should have been deducted from the contestee's total vote.

[16] Contestant, under his said sixteenth assignment (by his sixth proposition), challenged the vote of L. A. Berlin, who voted for contestee, on the ground that he was a minor on January 1, 1909, exempt from payment of poll tax, but did not secure certificate of exemption, as required by law. The evidence shows that this voter became 21 years of age on the 20th day of July, 1909, and did not appear before the tax collector, make affidavit, and secure certificate of his exemption from the payment of his poll tax for the year 1909. We therefore conclude, as in the case of Gordon Ridgeway, hereinbefore decided, that the vote of L. A. Berlin here considered should have been held illegal and deducted from contestee's total vote.

[17] Contestant, under his sixteenth assignment (seventh proposition), challenges the vote of C. E. Gist, who voted for contestee, on the ground that his vote was illegal, in that he did not reside in the state of Texas and had not resided in the county in which he voted during the six months next preceding said election, and that he did not reside in the precinct in which he voted at the time he voted. The evidence shows that C. E. Gist was a carpenter, and at one time a merchant in Adrian, Tex., during a part of 1909 and the early part of 1910; that about April, 1910, he sold out, left on a visit to Tennessee, and returned, passing through Adrian and going on into New Mexico, where he had a claim or farm; that since then he has been back to Adrian occasionally, coming on the day of the election to vote. Thomas Strock, William Dewey, and other residents of Adrian had not seen him in Adrian, except when he came on election day, since he sold out in April. W.

B. Hedrick saw him in New Mexico just prior to the election, and he had been at work at his trade in Tucumcari, and came from Tucumcari down to San Juan, where he had a claim. The witness Hedrick rode with him from Tucumcari, down to San Juan, when he told Hedrick that he had been at work carpentering at Tucumcari, and that he was going down to his place or home at San Juan; that he is a single man. We are of the opinion that the voter had not resided in Oldham county during the six months next preceding the election, nor in the precinct where he voted, and that his vote was therefore illegal, and should have been deducted from contestee's total vote.

[18] Contestant, under his said sixteenth assignment (proposition 8), challenged the vote of H. C. Wollaston, who voted in precinct No. 5 of contestee, on the ground that he was a married man, and that his wife and family resided at Collinsville, Okl., at the time he voted. The evidence shows that this voter, Wollaston, and his wife are permanently separated; that it had been four years since he had lived with his wife; "that he had never gone back to her since he left, and, if he kept his presence of mind, he never would go back." Appellant's contention is that, as the voter had never been divorced from his wife, his home and residence was in Oklahoma, where his wife was supposed to live. There is no contention on the part of appellant that the voter did not permanently reside in Texas one year and in Oldham county six months next preceding the election at which he voted. We are of the opinion that the evidence clearly shows that this voter was permanently separated from his wife for more than one year preceding the election; that his vote was legal and properly counted for contestee.

[19] Contestant, under his said sixteenth assignment (ninth proposition), challenged the vote of Thomas Noonan, whose vote was counted for contestee, upon the ground that he did not reside in the state of Texas for 12 months and in Oldham county for 6 months next preceding the said election, and that he did not reside in precinct 5 at the time of said election. The evidence shows that this voter was a single man and a painter, following up the line of railroad, painted the depots at Ontario, Adrian, and the stockyards at Vega, in Oldham county, then moved on west, following up the line of the railroad. He was in Adrian at such work in November, 1909, and left, going west somewhere, about the first of the year of 1910. Tom Strock, J. C. Elam, R. J. Mohler, Wm. Dewey, and other residents of Adrian (which is a village) had not seen him, except on the occasion of the election, from January 1, 1910 to November 8th, the time of the election, in or about Adrian, and that he had not been back to Adrian since the election. We think the trial court

erred in holding his vote legal, and that the same should be deducted from the total vote of contestee.

[20] Contestant, under his sixteenth assignment (tenth proposition), challenges the vote of F. J. Riterspach, whose vote was cast and counted for contestee on the ground that he owed and had not paid to Deaf Smith county a poll tax for the year 1909. The evidence shows that about the middle of September, 1908, he came to Hereford, in Deaf Smith county, and went to his brother's home. He was a married man and a doctor. Before leaving Ohio, he packed and stored his household goods, abandoned his home, and left his wife with relatives; that when he first came to Texas in September of 1908, he bought a lot in Adrian, Oldham county, Tex., with the fixed intent of building a house thereon, bought his lumber in Hereford, hauled it himself, and placed it on his lot in Adrian, and made a contract, before January 1, 1909, with a carpenter to erect his house on said lot. In January, 1909, he was called back to Ohio by the illness of his wife; returned in February, 1909, to Deaf Smith county. His lumber was burned by a prairie fire in February, which delayed his building. Brought his wife to Texas about August, 1909, and has been in Adrian ever since. We think the evidence as a whole shows that this voter, within three or four days of his arrival in Texas, bought lots in Adrian, Oldham county, and decided to make his home there, bought lumber, and made preparation to build there, remaining with his brother only temporarily, and did not, within the contemplation of the statute, so reside in Deaf Smith county on January 1, 1909, as to become subject to pay a poll tax in said county for said year; and that the court did not err in holding his vote, cast in Oldham county, legal, and in counting the same for contestee.

[21] Contestant, under his sixteenth assignment (eleventh proposition), challenges the right of Ralph R. Deets, whose vote was cast and counted for contestee, upon the ground that he never in fact resided in the state of Texas, nor in Oldham county, nor in precinct No. 5. This voter was one of five employés of the American-Canadian Land Company, an Iowa corporation. It was his duty to steer homeseekers from other states to Texas twice per month, and when in Texas with such excursionists would usually sleep on the car, and sometimes in the hotel, while showing the excursionists the country. He paid a poll tax in Oldham county. He sold a piece of land in Oldham county, and as part of the contract of sale leased the land and put in a crop by hired help. In registering at hotels, he would register as being from Cedar Rapids, Iowa, Sterling, Ill., and other places than Adrian, until in January, 1910, when the question of

removing the county seat from Tascosa to Vega began to be agitated, after which time he registered from Adrian. He has not been in or around there "since the election, except when on excursion." It is our opinion that the court erred in holding this voter legal, and that his vote should have been deducted from the contestee's total vote.

[22] Contestant, under his sixteenth assignment (twelfth proposition), challenges the right of Sam Kimble, who voted for contestee, on the ground that he was a minor on the 1st day of January, 1909, not subject to a poll tax, and failed to appear before the tax collector of his county, make affidavit, and secure certificate of exemption, as required by law. The evidence shows that Sam Kimble was residing in Hutchinson county on January 1, 1909, became 21 years of age on June 11, 1909, and did not appear before the tax collector, make affidavit, and secure certificate of exemption. This vote was counted for contestee. We are of the opinion that this vote was illegal, and should be deducted from the total vote cast and counted for contestee. The voter in all respects appears to have been situated, as to his right to vote in this election, as were the voters Ridgeway and Berlin. All three of these voters became of age in the summer of 1909, and we are of the opinion that he should have procured an exemption certificate. State Constitution, art. 6, § 2; State Election Laws 1905, §§ 2, 12, 19, and 23.

[23] Contestant, under his sixteenth assignment (thirteenth proposition), challenges the vote of Alejandro Garule, on the ground that he voted in precinct No. 6, Oldham county, and did not reside in said precinct at the time he so voted. The evidence shows with reference to this voter that he had paid his poll tax, and that he was residing in precinct No. 6, where he voted, and had been residing there for several months prior to that time. The evidence also shows that he had previously resided in precinct No. 1. Section 22, State Election Law 1905, 1st Extra Session, c. 11, provides as follows: "If a citizen, after receiving his poll tax receipt or certificate of exemption, removes to another county or to another precinct in the same county, he may vote at an election in the precinct of his new residence in such other county or precinct by presenting his poll tax receipt or his certificate of exemption or his written affidavit of its loss to the precinct judges of election and where he paid such poll tax or received such certificate of exemption and by making oath that he is the identical person described in such poll tax receipt or certificate of exemption and that he resides in the precinct where he offers to vote and has resided for the last six months in the district or county in which he offers to vote and twelve months in the state." We are of the opinion that no prescribed length

of residence is required, where the voter moves from one precinct to another in the same county; and, as the election officers received his vote, and the same was allowed and counted as cast, we must indulge the presumption that he made the necessary affidavit. Contestant's assignment as to said voter is therefore overruled.

[24, 25] Contestant, under his sixteenth assignment (fourteenth proposition), challenges the vote of Roy Vivian, on the ground that he resided in Dalhart, Dallam county, and not in Oldham county, at the time he voted. We are of the opinion that this objection is well taken. The evidence shows that the voter voted in precinct No. 6, and that his vote was counted and returned for contestee; that he was a single man and, at the time of the election, inspector for the cattle raisers' association; that he had been an employé of Frank Mitchell, manager of the Matador ranch, in Oldham county, for some time prior to October, 1909. In October, 1909, he quit working for the Matadors and returned to his father's home near Orange, in Orange county, Tex. In February, 1910, he came back to the Panhandle. He stayed in and around Tascosa for a while, and then went to Vega, Oldham county, and then went to work for Jones & Armstrong, gathering cattle for them. He then accepted employment for the cattle raisers' association, and they sent him to Lubbock and the Plainview country, where he inspected cattle until about the 1st of June, 1910. About the 1st of June, 1910, the cattle raisers' association stationed him at Dalhart, in Dallam county, where he rented a room from Mrs. Miller, which he occupied with his bed and clothing, etc., from about July 1, 1910, until March 3, 1911. While so residing at Dalhart and engaged as such inspector, he would go from Dalhart out to the pens at various points on the railroads and inspect cattle; and while so residing at Mrs. Miller's rooming house he would eat at different places as would suit his convenience. He went from Dalhart to the Matador ranch to vote at the time of the election. We think it is contemplated by our election law that if the voter (a single man), when he is not actively engaged in his work, has a room or habitation to which he usually returns, and where he usually sleeps at such times, then his right to vote in the precinct where such room or habitation is located is fixed by section 4 of the Terrell Election Law (Act of 1905), even though he should be there only a small per cent. of his time; but, if it should also appear that by reason of the nature of his occupation he was required to adopt a different place as one where he usually sleeps, then his right to vote at the former place is lost, and article 22 would govern his right to vote. We are of the opinion that his vote, as cast and counted, was illegal, and should be deducted from the contestee's total vote.

Contestant, under his sixteenth assignment (fifteenth proposition), challenges the vote of R. R. Young, cast and counted for contestee, on the ground that he did not reside in Oldham county and said precinct at the time he voted, but resided in Dallam county. This voter is a single man; and upon the evidence we are of the opinion that the objection to his vote is well taken and should be here sustained, for the same reasons and upon the same grounds given for excluding the vote of C. J. Collier and Roy Vivian. His vote should be deducted from the total vote cast for contestee.

[26] Contestant, under his seventeenth assignment (second proposition), contends that the trial court erred in sustaining contestee's challenge of the vote of H. M. Jackson, who voted for contestant, and in holding that said vote was illegal. This vote was contested by contestee on the ground that the voter had not resided, in good faith, in the county of Oldham six months next preceding the election. The evidence shows that he resided in the Panhandle prior to 1907 or '08. He then went to Pecos county with his family, and in March, 1910, he moved from Pecos to Vega, in Oldham county. He was residing in Pecos county January 1, 1909, and paid his state and county poll tax in that county. He sold out in Pecos county and left there in March, 1910, going to Vega, in Oldham county. At the time he was moving from Pecos, his wife went on a visit to South Texas and Oklahoma, and the voter returned direct to Vega and proceeded to build a house. His goods were shipped from Pecos to Hereford and freighted from Hereford north across the Oldham county line to Vega. We are of the opinion that the court erred in holding Jackson's vote illegal and in deducting it from contestant's total vote.

[27] Under his seventeenth assignment (third proposition), contestant complains of the action of the trial court in holding A. J. McKesson an illegal voter, on the ground that McKesson was residing in Oldham county at the time of the election and was a qualified voter, and that his vote is legal and valid. We do not concur in this contention, but are of the opinion that the evidence shows that this voter was not a resident, in good faith, of Oldham county for six months next preceding the election. The evidence shows: That he had been in the cattle business in Hemphill county and on one of the leases that Landergin brothers had from the Moody ranch. The Moody ranch is located in Hemphill county. That he had worked on this ranch about one or two years. That he held the position as foreman on said ranch during that time. That he lived with Mr. and Mrs. Hall, who kept house for him on that ranch. The witness Dick Cann testified by deposition as follows: "I live at Higgins, in Hemphill

county, Texas; have lived there eight years. I have known McKesson about three years around the vicinity of Higgins. He is engaged in the cattle business; has been here and in Kansas, when he would ship cattle. I do not know who has the Moody ranch leased, but McKesson has been working it and managing it for two or three years. He has been foreman of the Moody ranch for three or four years." (The Moody ranch is in Oldham county.) Frank Givings testified by deposition in February, 1911: "I live in Oldham county. On November 8, 1911, I was working for the Landergins. I was foreman of Landergin brothers' ranch. I have been foreman for about two years. I am acquainted with A. J. McKesson. I suppose I have seen him a dozen times at the Landergins' ranch, in Oldham county, during the six months prior to November, 1910. The last time I saw him. prior to that I think was in May, when they were bringing in the Wallace Good cattle from Bovina. A. J. McKesson was supposed to be working on the Landergin ranch, in Oldham county, within the last six months preceding November 8, 1910." Mrs. Ed. Hall testified by deposition on January 27, 1911: "I am acquainted with A. J. McKesson, and have known him four years. The Moody ranch is located in Oldham county. A. J. McKesson has been foreman of this ranch about two years." R. H. Jermany testified by deposition on January 21, 1911, as follows: "I have known A. J. McKesson for about three years. He has been handling cattle, and I understand he and Landergin are partners. Since I have known A. J. McKesson, he has roomed or boarded at Hall's most of the time. I think that is the man working for him on the Moody place. He has it leased for five years." We are of the opinion that contestee's challenge to this vote was properly sustained, and that said vote was properly deducted from contestant's total vote.

Contestant, under his seventeenth assignment (fourth and fifth propositions), complains of the action of the court in sustaining the challenge of the contestee as to the votes of Jim Dennis and Frank Breitkreutz, whose votes were cast for contestant, and in holding that the same were illegal. We are of the opinion that there was no error in the court so holding, and that the evidence shows that the said Dennis and Breitkreutz are in the same class with A. J. McKesson, heretofore considered, and did not reside in Oldham county during the six months next preceding the election, and that the court properly deducted said votes from the total vote cast for contestant.

[28] Contestant, under his seventeenth assignment (sixth proposition), complains of the action of the court in holding the vote of Jack Johnson illegal. Inasmuch as contestant, in his sixth requested conclusion of law, asked the court to find that this voter, Jack Johnson, together with Jim Dennis and others, were illegal voters, and to deduct their votes from the total vote of contestant, we are unable to see that there is any merit in his complaint here that the vote of Jack Johnson should be counted. We are further of the opinion upon the evidence that there was no error on the part of the court in holding said vote illegal and in deducting the same from contestant's total vote.

[29] Contestant, under his seventeenth assignment (seventh proposition), complains of the action of the court in holding the vote of J. B. Atkinson, who voted for contestant, to be illegal, upon the ground that he did not reside in Oldham county for the last six months preceding the election, and was not residing in the precinct where he voted. The evidence shows that this vote was cast and returned for contestant, and that the voter was a native of Milam county, Tex.; that during a vacation he came to Vega, declared his intention of becoming a resident of Vega, and after a short stay went to the University of Texas, at Austin, and was in the law department of the University of Austin; that he went from Austin to Vega to vote in the general election. He was a single man. He testified that he had resided in Vega, Oldham county, more than 6 months and in the state more than 12 months preceding November 8, 1910, when he voted; that on the 1st day of January, 1909, he resided in Milam county, Tex. We are of the opinion that under section 4, Terrell Election Law 1905, this voter was entitled to vote, and the court erred in holding said vote illegal and deducting the same from contestant's total vote.

[30] Contestant, under his seventeenth assignment (eighth proposition), complains of the action of the court in holding the vote of C. H. Cain, who voted for contestant, illegal. Contestee challenges the vote of C. H. Cain on the ground that he owed Bosque county a poll tax for the year 1909, which he had not paid prior to the 1st day of February, 1910. The evidence shows that this voter was subject to poll tax levied in Bosque county for the year 1909; that he did not move from said county until March of that year. It also shows that he paid, voluntarily, a poll tax in Oldham county; but we are of the opinion that the voluntary payment of this tax where it was not due did not relieve him of the legal liability to pay a poll tax to Bosque county. He could have properly paid his poll tax to Bosque county and voted on this receipt on a change of residence under the statute. We think there was no error in the action of the court complained of, and that said vote was properly held void and deducted from the contestant's total vote.

[31] Contestant, under his seventeenth assignment (ninth proposition), complains of the action of the court in sustaining the

challenge of contestee to the vote of L. E. Turrentine, who voted for contestant. This voter was challenged by contestee on the ground that he had not resided in Oldham county six months next preceding the election, and that he owed a poll tax to the county in which he resided in Texas on January 1, 1909, and failed to pay the same. The evidence shows that this voter resided in Deaf Smith county, Tex., on January 1, 1909, and was subject to the payment of a poll tax to that county for said year, which he did not pay, and also, we think, shows that he had not resided, in good faith, in Oldham county for six months next preceding the election. We therefore conclude that the court did not err in holding his vote illegal and deducting the same from the total vote of the contestant.

[32] Contestant, under his seventeenth assignment (tenth proposition), complains of the action of the court in holding the vote of J. E. Matkin illegal, whose vote was cast for contestant. This voter was challenged by the contestee on the ground that he owed a poll tax to the county where he resided in Texas on January 1, 1909, and did not pay the same prior to the 1st day of February, 1910. We are of the opinion that the evidence is sufficient to sustain the finding of the court that this vote was illegal; that the voter was subject to the payment of a poll tax in Deaf Smith county for the year 1909, which he did not pay; and that there was no error in the action of the court complained of. This vote was properly deducted from the total vote cast for contestant.

Contestant, under his seventeenth assignment (eleventh proposition), complains of the action of the court, wherein he finds that the vote of K. E. Lambert, who voted for contestant, is illegal. Contestee challenged this vote on the ground that he owed a poll tax to the county where he resided on January 1, 1909, and failed to pay the same prior to February 1, 1910, and also owed. a poll tax to the state in which he resided on January 1, 1909, and did not pay the same. We are of the opinion that the court correctly held Lambert an illegal voter. The evidence shows that he was a resident of Amarillo, Tex., on January 1, 1909, and subject to the payment of a poll tax to said county, which he did not pay prior to February 1, 1910. His vote was properly deducted from the total vote cast for contestant.

[33] Contestant, under his seventeenth assignment (twelfth proposition), complains of the action of the court in holding that the vote of J. E. Turpin, who voted for contestant, illegal. Contestee challenged this voter on the ground that he owed to the state of Texas and the county where he resided a poll tax for the year 1909, and failed to pay the same prior to the 1st day of February, 1910. The evidence shows that this voter arrived in Amarillo on the 1st

day of January, 1909, where he remained three or four days, then accepted employment from a contractor and went to Vega, in Oldham county, arriving there about the 4th day of January, 1909, where he went to work and remained at work until after the election, and that he did not pay a poll tax in Potter county. The evidence fails to show that he paid a poll tax, either state or county, either in Potter or in Oldham county. If he was subject to the payment of a county poll tax, it was to Potter county, and not Oldham county. The record does not warrant us in holding that he was· subject to the payment of a county poll tax in either of these counties. The evidence shows, further, that he was subject to the payment of a state poll tax by force of the statute, which he did not pay, and the payment of which was a necessary prerequisite of his being entitled to vote. We therefore conclude that the court did not err in holding this vote to be illegal and in deducting the same from the total vote cast for contestant.

[34] Contestant, under his seventeenth assignment (thirteenth proposition), complains of the action of the court in holding the vote of J. T. Owen, whose vote was cast for contestant, illegal. This vote was challenged by contestee upon the ground that the voter owed to Oldham county and the state of Texas a poll tax for the year 1909, which he did not pay prior to February 1, 1910. We are of the opinion that the evidence is sufficient to sustain the finding of the court that this vote was illegal. The testimony in part is as follows: Jesse Giles testified in February, 1911: "I am acquainted with J. T. Owen; have known him about three years. Since I have been knowing him, he has been living at Vega. He is a man of family, and his family has been living at Vega since the fall of 1908. When they came to Vega, they built a little house on wheels. They first lived at the hotel and then built the house." William Balfour testified as follows: "I am acquainted with J. T. Owen. I have run for office in this county twice. I had a conversation with J. T. Owen, prior to November 8, 1910, in regard to whether or not he was a voter, and he stated that he had not a vote, because he had not paid his poll tax." Lee Giles testified: "I am acquainted with J. T. Owen. I have known him since the first of 1908, or since the fall of 1907. J. T. Owen and his wife first came to my place in Vega on November 18, 1908; stayed there until the 1st day of February following. At that time she and Owen went into their own place. They had children with them at the time. They came in November." N. W. Armstrong testified: "I am acquainted with Col. Owen. He is a man physically sound. He did not pay a poll tax for the year 1909 in Oldham county, Texas. I think that he wired me in Missouri to pay his poll tax, and sent me

an order for poll tax. He never came to pay it; nor did he authorize any one to pay it for him. It was not paid." Sid Giles testified: "I met Mr. Owen in the summer of 1908 in Ontario, Oldham county, Texas. At that time he was engaged in the business of well digging. His wife and family came to Vega in the fall of 1908. Since they came to Vega, they have been in Vega. When they first came to Vega, they stayed at my father's hotel. I was presiding judge of the prohibition election in 1909, held at Vega. Owen presented himself at the election to vote. He did not vote, because he said he had been residing in this county since January, 1908, but did not pay any poll tax, and that was the ground I would not let him vote on." We therefore conclude that the court properly held Owen's vote illegal and deducted the same from contestant's total vote.

Contestant, under his seventeenth assignment (fourteenth proposition), complains of the action of the court in holding the vote of Roy Harrell, who voted for contestant, illegal. Contestee challenged this voter, claiming, among other things, that he owed to Deaf Smith county and the state of Texas a poll tax for the year 1909, which he had not paid prior to February 1, 1910. We think there was no error in the action of the court complained of. The evidence shows that Roy Harrell came from Illinois to Texas in 1908, stopping at Hereford. He located about 15 miles northwest of Hereford and made a crop there, and worked during the crop season with his brother. About the 10th day of October, 1908, he returned to Illinois, where he remained until about May, 1909. He testified in one place that when he went back to Illinois he went on a visit, and in another he testified that he went back there to vote, and that he did vote in the city election held there in April, 1909. He did not pay any poll tax to the tax collector of Deaf Smith county for the year 1909. We think the evidence sustains the court's finding in holding that this vote was illegal and in deducting the same from the contestant's total vote, as it is evident from the evidence that he resided in Deaf Smith county on the 1st day of January, 1909, making a crop, and was a single man, and was due a poll tax to the county of Deaf Smith and state of Texas, which he did not pay.

[35] Contestant, under his seventeenth assignment (fifteenth proposition), complains of the action of the court in holding the vote of A. D. Morgan, who voted for contestant, illegal. Contestee challenged the vote of A. D. Morgan on the ground that he had not resided in the state of Texas 12 months and in Oldham county 6 months next preceding the said election. The evidence in this case shows that about July 21, 1909, A. D. Morgan came from Oklahoma to Vega, in Oldham county, Tex., and took position as agent for the Rock Island Railroad; that about August, 1909, his wife joined him at Vega, and they began first to room in a box car and took their meals at the hotel; that they kept this up for a while until the company built a depot. When the depot was built, rooms were fixed up in the depot for them to reside in. They then furnished their rooms in the depot and lived in the depot, housekeeping, and Morgan acted as agent for the company; that about April 22, 1910, while so acting, he got telegraphic orders from the superintendent, directing him to go to Texola, in Oklahoma, and relieve the agent there. He left his wife and household goods behind and proceeded to Texola, and requested the next day after getting there to be relieved and returned to Vega as soon as possible. He was finally relieved at Texola on June 30th, and returned immediately to Vega, where he continued to reside until after the election. A few days after he left Vega to go to Texola, his wife went on a visit to her folks near Enid, Okl. They left their household goods unpacked in the rooms in the depot where they had been using them, and where they used them after their return from Texola. It is thus apparent that the voter Morgan nor his wife resided in Oldham county for 6 months and in the state of Texas for 12 months next preceding the election. We therefore conclude that the evidence sustains the action of the trial court in holding that he was an illegal voter, and that his vote should be deducted from the total vote cast for contestant.

[36] Contestee, by his first cross-assignment of error, complains of the action of the court in holding Albert Verdon to be an illegal voter and in deducting the vote cast by him from the total vote received by contestee. Contestant challenged this vote on the grounds that the voter had failed to pay a poll tax for the year 1909 to the county, state, and city of his residence; and the court sustained said challenge and held the vote to be an illegal one and deducted it from the total vote cast for contestee. The evidence shows that this voter arrived in Dalhart, Dallam county, Tex., about the 1st of November, 1908, and that he stayed in Dalhart about 3½ months; that when he left Dalhart he came to Amarillo, Potter county, and stayed there until about the 1st of May, 1909; that he then went to Oldham county, Tex., and has been residing in and around Tascosa ever since; that he never paid a poll tax, state, county, or city, anywhere in the state, nor did he authorize any one else to pay such tax for him; that some time in January, 1910, he received a letter from Mr. Charles Wilmering, for whom he was working, stating that he should pay his poll tax, and that he went to the sheriff of Oldham county and told him that he would pay his poll tax within a few days, but before he made up his mind to go over to the sheriff's he got a letter from Wilmering that

had a poll tax receipt in it, and that he did not do anything else about the poll tax; that he never authorized Mr. Wilmering to pay this poll tax for him, never told him to pay it, and that it was paid as a voluntary act on Wilmering's part; and that the poll tax receipt, which he received from Mr. Wilmering, was a receipt for a county poll tax, issued by the tax collector of Potter county, for the year 1909. In support of his contention that this voter was entitled to vote, contestee cites us to the case of Wallace v. Williams et al., 50 Tex. Civ. App. 623, 110 S. W. 785, wherein the First Court of Civil Appeals, in an opinion rendered by Chief Justice Pleasants, held: "The right of suffrage conferred by the Constitution does not depend upon the payment of his poll tax 'in person' by the voter. All that it requires is that the voter shall pay his poll tax on or before February 1st next preceding the election, and that he shall have his receipt therefor. The statute upon the subject directs that the voter shall pay the tax in person, or give a written order therefor; but it does not provide that a failure to obtain his receipt in the manner directed by the statute will disfranchise the voter. Each of the voters in question had complied with the provision of the Constitution by paying their poll tax and obtaining a receipt therefor regular upon its face; and the irregularity of the state or tax collector and the voter in the manner of making the payment and obtaining the receipt would not deprive the voter of his constitutional right of suffrage." It is to be noted, however, that the facts in this case, as found by the trial court, are different from the facts here under consideration. In the Wallace Case the facts show that the tax was paid for the voters in question on their verbal request and with money furnished by them. In the case of the voter here under consideration, we find from the evidence that his tax was not paid at his request, either verbal or written, and was not paid with his money, but was paid by a volunteer with his own money, and without any authority to make such payment; and we perceive no conflict with the opinion referred to of the First Court of Civil Appeals and ours here, holding that such payment so made by a volunteer with his own money, and not that of the voter, and without request or authority from the voter, does not comply with the requirements of the Constitution to the effect that the voter shall pay his poll tax. To hold that a voter thus equipped with a poll tax receipt, procured without his authority, and paid for with the money of another, is entitled to vote would, in our opinion, disregard the plain letter of the Constitution, thus breaking down the barrier interposed by the Constitution to protect the purity of the ballot and open up the floodgates of political corruption. We are of the opinion that, aside from the question as to whether the city of Dalhart or the county of Dallam levied a poll tax for the year 1909, the record shows that the voter was due the state a poll tax which he did not pay, as required by law, and that the court properly held him an illegal voter and deducted the vote cast from the total vote received by the contestee.

[37] Contestee, by his second cross-assignment, complains of the action of the court in holding F. A. Marsh an illegal voter and in deducting his vote from the total vote received by contestee. We are of the opinion that Marsh was not a legally qualified voter, in that he had not resided in the state of Texas 12 months next preceding the election. The evidence shows that Marsh was a resident and domiciled in the territory of Arizona until the last day of October, 1909; that about that time he left Arizona, apparently destined for Clovis, N. M.; that he, his wife and daughter, arrived at Clovis on the 9th day of November, 1909; that he remained there a day or so, left his wife there, and went on a prospecting tour, going first to Adrian, Oldham county, and while at Adrian made contract for the purchase of lots, rented a house, was at Adrian a day or two at that time; that he then left Adrian and went to Shattuck, Okl., to collect some accounts he had there; that he arrived at Adrian the second time, bringing with him his wife and daughter, some time between the 10th day of November and December 1, 1909; that they first boarded at the Giles Hotel until their goods arrived, when they moved into the house he had rented; that they stayed in that house six or seven months, and then went into a house that he had built for himself; that while in Clovis he had opened a bank account and ran the account for two or three months; that his goods did not come direct from Arizona to Adrian, but were billed to Clovis and rebilled there; that his wife, during her stay in Clovis, was visiting with some people whom she knew; that when he first visited Adrian, about the 3d or 4th of November, 1909, he was satisfied and decided to locate there; and that when he got back to Clovis about the 15th or 16th of November he had a talk with his wife and tried to persuade her to come to Adrian with him, and that she decided to go. The evidence also shows that Mrs. Marsh, the voter's wife, evidently arrived at Adrian about December 1, 1909, from which date we conclude his residence, in legal contemplation, begins in Oldham county, and, as the election at which he voted was held on the 8th day of November thereafter, we conclude that he had not resided in the state of Texas for 12 months next preceding the election, and that the court correctly held him an illegal voter and deducted his vote from the total vote cast for contestee.

[38] Contestee, under his third cross-assignment of error, contends that the court

erred in holding Ole Olson to be an illegal voter and in deducting the vote cast by him from the total vote received by contestee. In this contention we concur. The evidence shows that in 1908 this voter purchased a half section of land in Oldham county, and in August, 1909, he and his wife came to Texas to look at the land and stayed a week and returned to Iowa, and that they made up their minds that they would sell their property and move to Oldham county and live upon the half section of land; that they did sell a part of their property, and on October 25, 1909, he loaded his car with mules, feed, farming implements, and a part of his household goods and, together with his son, arrived at Adrian, Oldham county, on November 1, 1909, and at once moved upon said land and began to cultivate and improve it; that his wife did not accompany him at the time; that she was confined by sickness and could not come with him; that he stayed upon the land until just before Christmas, 1909, and then returned to Iowa and remained with his wife, who was sick, until in March, at which time he left there with his wife, and the rest of his household goods, and came to Oldham county, and is living there now, and has been since living upon the land with his family; that his son accompanied him in October, 1909, and remained upon said land and cared for it for witness during the time he was absent in Iowa with his sick wife. We therefore conclude that the court erred, as aforesaid, in holding Olson to be an illegal voter, and that his vote should be added to the vote here allowed for contestant.

[39] Contestee, under his fourth and fifth cross-assignments, contends that the court erred in holding P. H. and John Landergin legal voters, and in not deducting their votes from the total vote received by contestant. We are of the opinion that there was no error in the holding of the court complained of. The evidence shows that they were brothers; that John Landergin was a single man; that they were interested in business together, and that John made his home with his brother, P. H. Landergin; that they moved to Oldham county several years prior to the election, acquired a ranch in Oldham county, and established their home thereon; that three years prior to August, 1911, P. H. Landergin and wife determined to educate their daughter at a school in Wichita, Kan.; that they rented from Mrs. Frost a house in Wichita, to be used as a place of residence by the wife and daughter during the school term; that during the school vacations and at other times they returned to the ranch, and from there made visits and trips as suited their convenience and pleasure; that the business of the Landergin brothers is such that they travel a good deal; that John spent but little or practically no time in Wichita; that P. H. spent what time he could from his business with his family while the daughter was attending school in Wichita, but that the same was comparatively a small portion of his time. We are of the opinion that the evidence shows that these two voters had established a permanent domicile or residence in Oldham county long prior to the occurrence of the election, and that the absence of each of them therefrom was of a temporary character and did not forfeit the legal residence acquired in said Oldham county. We therefore conclude that the court correctly held P. H. and John Landergin to be legal voters in Oldham county and allowed their votes for contestant.

[40] Contestee, by his sixth cross-assignment of error, complains of the action of the court in holding Frank Pylant to be a legal voter, and in not deducting his vote from that cast for contestant, on the ground that he owed a poll tax to the city of Hereford for the year 1909, which he did not pay. The evidence shows that some time prior to the 7th of April, 1908, the city council of Hereford levied a poll tax of one dollar upon all male inhabitants subject to the payment of poll tax and living within the limits of its said city, but we are unable to determine from the evidence whether this voter, either on the 1st day of January, 1909, or at the date of the passage of said ordinance, was living within the city limits or not; and, as the burden was on the contestee to show that this voter was legally subject to such city poll tax, and has failed to make such proof, we indulge the presumption that the court correctly held that he was not subject to such tax and was a legal voter, and properly refused to deduct his vote from the total vote cast for contestant.

[41] Contestee, by his seventh cross-assignment, complains that the court erred in holding J. R. Bryant to be a legal voter, whose vote was counted for contestant, on the ground that the voter resided in Deaf Smith county on January 1, 1909, and failed to pay to said county a poll tax for that year before February 1, 1910. The evidence shows that Bryant worked for Jackson Bros., and was working for them January 1, 1909, in Deaf Smith county, where he had worked for some time; that he quit working on said ranch in Deaf Smith county and took up his residence in Oldham county the latter part of the summer of 1909. We are of the opinion that this voter was due the payment of a county poll tax to Deaf Smith county and failed to pay the same, as required by the law, and the fact that he did pay one to Oldham county, to which he was not subject, does not constitute him a legal voter, and that the court erred, as alleged, in not deducting his vote from the total vote received by contestant.

[42] Contestee, under his eighth cross-assignment, complains that the court erred in holding C. L. Poole to be a legal voter, and in not deducting his vote from the total vote

cast for contestant, on the ground that he was shown to be subject to the payment of a city poll tax to the city of Amarillo for the year 1909, and did not pay the same. The evidence shows that this voter resided within the city limits of Amarillo on January 1, 1909; that the city levied a poll tax for that year, and that the said voter did not pay said tax; that he was 23 years old. His vote was accepted by the election officers, cast and counted for contestant, and the issue with reference to him is as to whether or not he was exempt from the payment of the city poll tax on account of being a member of the National Guards. The evidence shows that he was such a member, but does not affirmatively show whether or not the captain or commanding officer of the company to which C. L. Poole belonged complied with the law, in order to exempt him from the payment of the city poll tax. Under this state of the evidence, his vote having been accepted and counted by the officers of the election and held legal by the trial court, we think the presumption in favor of its legality should be indulged, and that the burden is upon the contestee to show by the evidence that his vote was illegal; and, the contestee having failed to discharge this burden, we conclude that the court did not err in holding him a qualified voter.

[43] Contestee, under his ninth cross-assignment, contends that the returns from election precinct No. 2 should be disregarded and not considered in determining the result of this election, upon the ground that there was a fraudulent conspiracy entered into for the purpose of carrying said election box by illegal votes, and that the majority of the votes cast at said box were illegal, and that the illegality of such votes was known to the election officers holding the election. We are of the opinion that we are not warranted by the evidence in refusing to consider the returns from this box. If a conspiracy to carry said box by illegal votes, in favor of either candidate, has been shown, the evidence does not show that it had ever been carried into effect; nor is it shown that the alleged form of ballot, which, it was claimed, was made out by P. H. Landergin the night before the election and "passed some of the boys," had any effect whatever in influencing illegally the vote of any one. We have held that some of the votes cast at that box were illegal, and declined to consider them in reaching the result declared in this opinion. We have also found that there were legal votes cast at said box, and to throw out this box entirely would deprive the legal voters of their constitutional right of suffrage, and the candidate receiving such legal votes of what is justly due him, and we do not think that we are authorized by law to go to this extent.

The acts complained of do not appear to be criminal under the provisions of the Terrell Election Law, and, if they were, this is not the tribunal to pass upon them; nor is the rejection of the entire box the proper statutory penalty therefor. Said cross-assignment is therefore overruled.

Having carefully examined all of contestant's assignments, not hereinbefore specifically discussed, we conclude that there is no material error presented under the same, or either of them, and they are accordingly here overruled.

We have carefully examined the record with reference to each vote properly presented for our consideration, both by contestant and under the cross-assignments of contestee, and find that, under the law and the evidence, contestee received and is here allowed 73 of the legal votes cast in said election, and that contestant received and is here allowed 75 of the legal votes; the same being a majority of all the legal votes cast at said election. We therefore conclude that contestant, A. F. Linger, received a majority of the legal votes cast at said election on the 8th day of November, 1910, was duly elected county and district clerk of Oldham county, Tex., and that the judgment appealed from should be in all things reversed and here rendered for contestant; and it is accordingly so ordered.

GRAHAM, C. J., not sitting.