STUBBS v. MOURSUND. (No. 6165.)

(Court of Civil Appeals of Texas. Austin.
Feb. 4, 1920. Rehearing Denied
June 2, 1920.)

1. **Elections** ⬤⟲293(1)—**Ballot with erased lead pencil marks held ambiguous, authorizing explanation by voter.**

A ballot at a general election cast for district and county clerk, whereon perpendicular lead pencil lines had been drawn through all the party tickets, one of them indicating an attempted erasure, and other horizontal pencil marks had been made through the names of certain candidates, the face of the ballot was ambiguous, and permitted the voter who cast it to explain why he voted it in that condition.

2. **Elections** ⬤⟲190—**Mutilated ballot should be counted if voter's intent can be ascertained therefrom.**

There is no statutory law prohibiting a mutilated ballot from being counted, and if the intent of the voter can be ascertained by the ballot cast, in the light of surrounding circumstances, effect should be given to the ballot in accordance with such intent.

3. **Elections** ⬤⟲190—**Ballot containing partly erased lead pencil marks held not "mutilated."**

A ballot cast for district and county clerk, containing horizontal marks through names of certain candidates, and also perpendicular lead pencil marks through all the party tickets, one of which marks, indicating an attempted erasure, held not a "mutilated" ballot; "mutilated" meaning "destitute or deprived of some essential or valuable part; greatly shortened."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Mutilate.]

4. **Elections** ⬤⟲180(7)—**Pencil mark through names of candidates held to indicate intention not to vote for them.**

Where a ballot cast at an election for district and county clerk bore horizontal lead pencil marks through the initials of the names of candidates for that office, such ballot held sufficiently to indicate that the voter did not intend to vote for such candidates, but did intend to vote for those whose names were not marked in any respect.

5. **Officers** ⬤⟲78—**Statute for contesting elections does not destroy previously existing right of litigating title to office.**

The statute providing for contesting elections does not destroy the right which existed before it was enacted to litigate the title to an office.

6. **Elections** ⬤⟲238—**Where candidate legally elected special election to determine tie will not oust him.**

Where a candidate for the office of county and district clerk was legally elected at a general election, a special election ordered thereafter, on the ground that the vote was a tie, held not to deprive such candidate of his right to hold the office.

Appeal from District Court, Blanco County; Geo. Calhoun, Special Judge, by exchange with Judge Stubbs, disqualified.

Proceedings for mandamus by Albert Moursund against B. J. Stubbs. Judgment for plaintiff, and defendant appeals. Affirmed.

White, Cartledge & Wilcox and Fiset & Shelley, all of Austin, for appellant.

R. E. McKie, of San Marcos, and V. B. Goar, of Johnson City, for appellee.

KEY, C. J. At the general election held in 1916, B. J. Stubbs was elected district and county clerk of Blanco county, and qualified and served as such. At the general election held November 5, 1918, he was a candidate for re-election, and Albert Moursund was a candidate for the same office. In due time after the election the commissioners' court of Blanco county canvassed the election returns, and ascertained and declared, as the result of such election, that Stubbs and Moursund had each received 341 votes, and ordered a special election for that office, to be held on December 21, 1918. That election was held, Stubbs and Moursund being the only candidates, and the result being a majority of 78 votes for Moursund. After canvassing the returns, the commissioners' court declared Moursund duly elected, and issued to him a certificate to that effect. Thereafter, and within due time, Moursund gave the bond required by statute, which was properly approved, and he also took the oath of office required by the Constitution; also, and within due time he received a commission from the Governor of Texas, reciting that he had been duly elected, etc.

After the result of the special election had been declared, Stubbs notified the comissioners' court that he considered such election illegal, and held without authority of law, and contended that he had received a majority of the votes cast in the general election on November 5, 1918, and therefore claimed the right to such office. He also took the oath of office required by the Constitution, and tendered to the commissioners' court an official bond in due form, which the court declined to receive and approve.

After receiving his certificate of election and qualifying as stated, Moursund demanded of Stubbs possession of the office rooms, furniture, record books, papers, and paraphernalia belonging to the office, which Stubbs refused to surrender; and on February 25, 1919, Moursund brought this suit against Stubbs, praying for a writ of mandamus, compelling the defendant to deliver to the plaintiff the rooms provided by the county for the use of the county and district clerk, together with all books, papers, records, archives, and paraphernalia belonging or pertaining to the office of county and district clerk of Blanco county, etc.

⬤⟲For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The defendant Stubbs filed an answer, including a general and special exception, a general and special denial, and special answer, averring that he was duly elected county and district clerk of Blanco county at the election held on the 5th of November, 1918; and therefore the commissioners' court had no authority to order the election held on the 21st day of December following, and that the same and the proceedings connected therewith were and are wholly void. The special plea referred to alleged that while the returns sent in to the commissioners' court showed that the plaintiff and defendant each received 341 votes, a mistake was made by the election officers in tabulating and preparing the returns from one of the election precincts, by which the plaintiff Moursund was allowed one vote more than he received. The plea also alleged that several persons not entitled to vote were permitted to vote for the plaintiff, Moursund, and that, after excluding such illegal votes, he (the defendant) received a majority of the legal votes cast at the election held November 5, 1918.

The plaintiff filed his supplemental petition, demurring and excepting to the defendant's cross-action upon various grounds. It also contained a general denial and other averments, tending to show that the defendant had not complied with the statute regulating contested elections; and specially denied that the defendant received a majority of the legal votes cast at the election held November 5, 1918; and averred that, if that election did not in fact result in plaintiff and defendant each receiving an equal number of the qualified votes, then that he (plaintiff) received a majority of such votes, and that ballots were counted for the defendant in that election which should not have been so counted, because they were illegal, and ballots were not counted for the plaintiff which were legal and should have been counted; and the plea sets out with particularity the alleged legal and illegal ballots referred to.

The defendant filed a supplemental answer which contained a general and several special exceptions to the plaintiff's supplemental petition and a general denial of the allegations therein.

The plaintiff filed a second supplemental petition, in which he withdrew certain allegations in his first supplemental petition, charging that Will Crossley was not a legal voter, and alleging that the averment withdrawn was made by inadvertence, and that Crossley was a qualified voter. The plaintiff also filed a trial amendment, setting up some additional facts relating to the legality of certain votes that were cast for the defendant.

The defendant filed a second supplemental answer, which contained exceptions to the plaintiff's trial amendment, and a general denial of the allegations contained therein, and a special denial, and several averments relating to the right of certain persons to vote.

The plaintiff filed a second trial amendment, charging that certain other persons, who were not entitled to vote, were permitted to vote for the defendant; and alleging certain additional facts relating to the validity of certain votes, already put in issue by the pleadings.

There was a non-jury trial, in which the court overruled the various demurrers and exceptions presented by each party, and, after hearing and considering the case upon its merits, rendered judgment for the plaintiff for the relief prayed for, and the defendant has appealed.

The trial court filed findings of fact, which, in so far as they are challenged by appellant, this court holds are sustained by testimony.

Neither time nor reasonable regulation concerning the length of opinions will permit review and discussion of all the testimony bearing on the issues referred to. However, two of the original ballots have been sent up for the inspection of this court, and some observations concerning them are deemed appropriate.

Ballot No. 29 was voted by Edwin Bindseil, a qualified voter. It consists of five perpendicular columns, the first headed "Democratic Party"; the second, "Republican Party"; the third, "Socialist Party"; the fourth, "Independent Party"; and the fifth having no heading. The Democratic column had the names on it of Democratic nominees, no names appearing thereon for county and precinct offices, presumably because that party made no nominations for such offices. The Republican column was substantially the same, while the Socialist column had names of candidates for most, but not all, state offices, but none for county offices. The Independent column had no names on it for any office above representative in the Legislature, but had the name of one candidate for county judge; no candidate for county attorney; Albert Moursund and B. J. Stubbs, for county and district clerk; J. R. Johnson and A. J. Wagner, candidates for sheriff and tax collector; G. A. Cammack, candidate for tax assessor; J. E. Page, W. E. Stevenson, and J. C. Goar, candidates for county treasurer; and Max H. Lungwitz, candidate for county surveyor. The other column, which had no heading, had printed on it, as had all the other columns, the title of the different offices, but no names were printed in that column. The ballot shows on its face that perpendicular pencil lines were run through all the columns, and that such line on the Independent column extended through and beyond the names of both Albert Moursund and B. J. Stubbs, on through the names of both candidates for sheriff, of the candidate for tax assessor, the three candidates for county treasurer, and the candidate for county

surveyor. However, an inspection of it indicates that an unsuccessful effort had been made to erase that perpendicular line, which was made with a pencil, and the same indication appears with reference to the perpendicular line which was made across the column which had no heading and no names upon it. The face of the ballot also shows quite plainly that horizontal pencil marks had been made through the name of B. J. Stubbs, candidate for county and district clerk; A. J. Wagner, candidate for sheriff and tax collector; and J. E. Page and J. C. Goar, candidates for county treasurer; while the names of Albert Moursund, candidate for county and district clerk, J. R. Johnson, candidate for sheriff and tax collector, and W. E. Stevenson, candidate for county treasurer, were not marked otherwise than by the perpendicular line, which passed through the names of all of the candidates in that column.

[1] Such being its condition, the trial court held, and we think correctly, that the face of the ballot was ambiguous, and permitted the voter who cast the same to explain why he voted it in that condition. He testified that the perpendicular pencil mark through the column headed "Independent Party" was inadvertently made, and that he undertook to erase it, but, the eraser being defective, he was unable to accomplish that result; whereupon he ran pencil lines horizontally through the names of the candidates he did not desire to vote for, and left the names of the candidates for whom he intended to vote without any such marks upon them.

The trial court held that appellee, Moursund, was entitled to have the ballot referred to counted for him, and we sustain that ruling.

In Davis v. State, 75 Tex. 430, 12 S. W. 957, the Supreme Court held that a ballot should be construed as any other written instrument, and, in the event the intention of the voter is clear, extrinsic evidence should not be admitted; but, if from the face of the ballot, the intention be doubtful, then evidence of the circumstances under which it was made out, if calculated to throw light upon the intention, should be admitted.

Counsel for appellant present the contention that the ballot referred to shows upon its face that it had been mutilated; and, therefore, inasmuch as the statute provides that when a ballot has been mutilated the voter may return the same to the election officer and receive another ballot, the ballot under consideration should not be counted for either party.

[2] There is no statutory law which prohibits a mutilated ballot from being counted, and the general trend of decisions in this respect is to hold that, if the intent of the voter can be ascertained by the ballot cast, in the light of the surrounding circumstances, effect should be given to the ballot in accordance with such intent.

In Hanscom v. State, 10 Tex. Civ. App. 638, 31 S. W. 547, Judge Williams, speaking for the Galveston Court of Appeals, said:

"It is a mistake to assume that it works any such radical change in the election laws of this state as has been wrought in other states by the adoption of a new and complete system of election laws modeled after that of Australia. Decisions of the courts of those states enforcing the minute and rigid regulations of their statutes have often very little application here, and are apt to be misleading rather than otherwise."

However, we are not prepared to hold that the ballot in question was a mutilated ballot within the purview of the statute. The Standard Dictionary defines the word "mutilated" to mean, "destitute or deprived of some essential or valuable part; greatly shortened." It defines the word "mutilate," "to cut off or deprive of a limb or essential part." The Century Dictionary gives substantially the same definitions.

[3] The ballot under consideration is complete in all respects, and is not mutilated, unless it be that the perpendicular line running through the names of all candidates, and the horizontal marks placed through the names of appellant, Stubbs, and several other candidates, constitute mutilation, and we hold that they do not.

In the case last cited the court said:

"Mere marks are not among the things which are declared to avoid the ballot, unless they are 'stamp marks.'"

There is no law in this state declaring void and prohibiting the counting of a ballot which has been inadvertently or improperly marked, and if such ballot, either upon its face or when construed in connection with surrounding circumstances, indicates, with reasonable certainty, how the elector intended to vote, it should be so construed as to give effect to such intention. Hence we hold that the trial court ruled correctly in counting the ballot in question in favor of appellee.

[4] Original ballot No. 130 is in this condition. It is printed in the same form as the one just considered, and has plain pencil marks running horizontally through the initials of B. J. Stubbs, candidate for county and district clerk; A. J. Wagner, candidate for sheriff and tax collector; W. E. Stevenson and J. C. Goar, candidates for county treasurer, leaving unmarked the names of Albert Moursund, candidate for county and district clerk; J. R. Johnson, candidate for sheriff and tax collector; and J. E. Page, candidate for county treasurer. The names of the Republican and Socialist candidates for governor, lieutenant governor, and comptroller were so marked as to indicate that the voter did not intend to vote for either of those can-

didates; but there are no other marks anywhere on the ballot, except those referred to as "horizontal marks" through the initials of appellant, Stubbs, and some other candidates for county offices. As both the Democratic and Republican columns had candidates' names printed on them down to and including candidates for Congress, except there were no Republican candidates for the Court of Civil Appeals and for district attorney, and as the voter did not attempt to erase any of the names in the Republican column below that of comptroller, and as the Democratic nominees were the only candidates for the Court of Civil Appeals and district attorney, it is quite evident that with the exception of United States senator, governor, lieutenant governor, and comptroller, the voter did not intend to vote except for county offices, unless it be that he intended to vote for the Democratic candidates for the Court of Civil Appeals and district attorney, whose names were printed in the Democratic column, and who had no opposition; and the question is, did the horizontal marks, which he made through the initials of certain candidates, sufficiently indicate that he did not intend to vote for such candidates, but did intend to vote for those whose names were not marked in any respect? The trial court held that it did, and we are not prepared to say that that holding was erroneous.

The law requires the voter to run a mark through the names of the candidates for whom he does not desire to vote, thereby leaving but one name unmarked to indicate the candidate for whom he intends to vote. It would be construing the law too strictly to hold that the mark referred to must extend all the way through the entire name, in order to indicate that the voter did not intend to vote for that person. To illustrate: Suppose in this case the horizontal mark, which extended through the initials "B. J.," had extended on through half, or even through the first letter, of the word "Stubbs," would any one deny that such mark failed to indicate that the voter did not intend to cast his ballot for Mr. Stubbs? Or suppose the initials had been left unmarked, and the pencil mark run through the name "Stubbs" could it reasonably be contended that such mark did not show, with sufficient certainty, that the elector intended to vote for Albert Moursund, and not for B. J. Stubbs? And the fact that the voter marked the names of three other candidates in the same manner tends strongly to show that he intended to vote for candidates for three offices, which were county and district clerk, sheriff, and treasurer; and when he marked names of candidates for all those offices, and left unmarked one name for each office, we think it appears, with sufficient certainty, that he intended to vote for those whose names were in no wise marked.

As pertinent to this ballot and the question under consideration, we quote as follows from the opinion of the Supreme Court, in Davis v. State, 75 Tex. 430, 12 S. W. 960:

"It is shown by the bill of exceptions that the court, over the objections of respondent, counted the vote of one George Rector for relator. The ground of the objection was that both names appeared upon the ballot, and that neither appeared to have been erased. The original ballot is in the record, and upon it, just above the name of Davis, which is above that of Wren, there is found a broad pencil line, obliterating a part of the first initial of the former's name, and barely touching the second. In discussing the two original ballots sent up with the record, we have spoken of erasures. We mean constructive erasures—that is to say, such lines drawn across the names as clearly show an intention to erase them. In both ballots the lines are made with a pencil, and are so faint that the printing beneath is perfectly legible. None of the names are actually erased. The line, however, is usually drawn through the name from the beginning to the end. In this case there is a broad line drawn just above the name of Davis, and very close to it, which it is to be presumed was drawn for some purpose. It does touch two letters of the name, and erases in part the first—that is to say, the distinctive legal initial. 'It is not necessary to obliterate the name entirely.' McCrary on Elec. § 411. "We think, in the absence of proof explaining the ambiguity of the ballot, the court did not err in treating it as if Davis' name was erased, and in counting it for relator."

Appellant's challenges of most of the other votes complained of are based upon the ground that persons who cast such votes were not at that time residents of Blanco county, and therefore were not entitled to vote. We have carefully considered the testimony, which, in some respects, is conflicting, and have reached the conclusion that the findings of the trial court, in the respects complained of by appellant, are sustained by evidence.

[5, 6] Appellee has presented numerous cross-assignments, some relating to the action of the trial court in overruling demurrers and exceptions, and others complaining of the findings of fact relating to alleged illegality of votes cast for appellant, which questions it is not necessary for this court to decide, as the conclusions already announced must lead to an affirmance of the judgment in appellee's favor. However, as it is earnestly insisted in behalf of appellee that the trial court erred in not sustaining appellee's exceptions to appellant's cross-action, and as numerous authorities in other jurisdictions are cited in support of that contention, we deem it proper to say that we are inclined to agree with appellant's contention, which, in substance, is that notwithstanding the fact that we have a statute which provides for contesting elections, that statute does not destroy the right which existed before it was enacted to litigate the

title to an office; and if appellant was legally elected at the general election held November 5, 1918, it seems to us that the special election ordered thereafter, together with the result of such election, should not be held to deprive him of his right to hold the office. The statute regulating contested elections did not afford him an adequate remedy. As the commissioners' court declared no one was elected at the November election, he had no right and could not institute a contest, and he does not claim to have had any right to contest the subsequent election, if it was lawfully held. Such being the case, under our liberal system of procedure we feel inclined to hold that he had the right in this case to resist the plaintiff's claim, upon the ground that he was legally elected at the general election held in November, 1918.

Appellee's other cross-assignments, relating to the legality of certain votes counted for appellant have not been passed upon, because the judgment in appellee's favor can be affirmed without doing so.

All of the questions presented in appellant's brief have been considered, and are decided against him.

In conclusion, we desire to commend counsel for both appellant and appellee for the assistance rendered this court by the helpful briefs and arguments filed by them.

Our conclusion is that the judgment should be affirmed; and it is so ordered.