## J. O. DUNCAN, COUNTY ATTORNEY UPSHUR COUNTY V. CLAYTON WILLIS ET AL.

No. A-6104. Decided May 15, 1957.
Rehearing overruled June 19, 1957.
(302 S.W. 2d Series 627.)

*Fulton, Hancock & McClain* and *Hollie G. McClain,* all of Gilmer, for petitioner.

318

*Looney E. Lindsey, Power, McDonald & Mell* and *Milton Greer Mell*, all of Gilmer, for respondents.

MR. JUSTICE NORVELL delivered the opinion of the Court.

■ This is an election contest and while judgments in such proceedings are ordinarily final in the Courts of Civil Appeals, we took jurisdiction by reason of the admitted conflict between the decision below, Willis v. Duncan, County Attorney, Texas Civ. App., 294 S.W. 2d 914, and one of the numerous holdings made in Linger v. Balfour, Texas Civ. App., 149 S.W. 795. See Articles 1728 and 1821, Vernon's Ann. Texas Stats., as amended by Acts of the 53rd Leg., (1953) ch. 424, p. 1026. Following oral argument we have concluded to resolve the conflict in favor of Linger v. Balfour. Writ of error having been granted to settle a conflict of decisions, our jurisdiction extends to all properly presented questions of law in the case. Holland v. Nimitz, 111 Texas 419, 232 S.W. 298, 239 S.W. 185. In order to determine the proper order to be entered in the cause it is necessary for us to examine the assignments of error urged in the application for writ of error and the points of error contained in the brief of the prevailing party in the Court of Civil Appeals. If such brief presents matters which would call for an affirmance of the judgment of the Court of Civil Appeals despite efficiently raised errors contained in the application, the judgment of the lower court should be affirmed. Holland v. Nimitz, 111 Texas 419, 232 S.W. 298, on reh. 239 S.W. 185; West v. Carlisle, 111 Texas 529, 241 S.W. 471; Vanover v. Henwood, 136 Texas 348, 150 S.W. 2d 785.

Our examination of the various contentions of the parties which are pertinent to the proper disposition of this cause under the rule above set out leads us to the conclusion that the judgment of the Court of Civil Appeals should be affirmed despite its failure to apply the rule of decision laid down in Linger v. Balfour. We shall discuss the points raised by the respective parties in the order presented in the application for writ of error and the appellants' brief in the Court of Civil Appeals. Opinions of the various Courts of Civil Appeals cited in this opinion are for the most part election contest cases in which applications for writ of error were not filed. We will indicate

those cases in which some action was taken by this Court upon an application for writ of error.

The disputed election was one relating to the consolidation of two common school districts in Upshur County, Texas which we shall refer to as the Glenwood District and the East Mountain District. In its canvass of the returns the Commissioners Court determined that the consolidation proposal failed because of a want of a majority in the Glenwood District,—the vote being 92 votes for and 92 votes against consolidation. Clayton Willis and others contested the election and the district court held that the consolidation proposal had been defeated by a vote of 91 to 90. This holding was reversed by the Court of Civil Appeals and the original contestee brings the case here as petitioner. In addition to a motion to dismiss, petitioner in his application asserts that the votes cast by the following persons were illegal and should not be counted, viz.:

B. E. Butler and wife, Floyd Craig and wife—these four votes were not counted by the district judge. The Court of Civil Appeals held that they should have been counted for consolidation.

Clyde Ray and wife, Roland T. Drake and wife, and Jean (or Gene) Webb—these voters were apparently cast for consolidation and considered legal votes by both the trial court and the Court of Civil Appeals.

In Linger v. Balfour, Texas Civ. App., 149 S.W. 795 it appeared that the poll tax of the voter Albert Verdon had been paid by his employer without his knowledge and consent. The holding that this vote was illegal was placed upon the constitutional provision that "any voter who is subject to a poll tax under the laws of the State of Texas shall have paid said tax before offering to vote at any election in this State and hold a receipt showing that said poll tax was paid before the first day of February next preceding such election." [Art. 6, Sec. 2, Vernon's Anno. Const. of Texas]. It was said in the Balfour opinion (149 S.W. 1.c. 808) that:

"* * * In support of his contention that this voter was entitled to vote, contestee cites us to the case of Wallace v. Williams et al, 50 Texas Civ. App. 623, 110 S.W. 785, wherein the First Court of Civil Appeals, in an opinion rendered by Chief Justice Pleasants, held: 'The right of suffrage conferred by the Constitution does not depend upon the payment of his poll tax

"in person" by the voter. All that it requires is that the voter shall pay his poll tax on or before February 1st next preceding the election, and that he shall have his receipt therefor. The statute upon the subject directs that the voter shall pay the tax in person, or give a written order therefor; but it does not provide that a failure to obtain his receipt in the manner directed by the statute will disfranchise the voter. Each of the voters in question had complied with the provision of the Constitution by paying their poll tax and obtaining a receipt therefor regular upon its face; and the irregularity of the state or tax collector and the voter in the manner of making the payment and obtaining the receipt would not deprive the voter of his constitutional right of suffrage.' It is to be noted, however, that the facts in this case, as found by the trial court, are different from the facts here under consideration. In the Wallace Case the facts show that the tax was paid for the voters in question on their verbal request and with money furnished by them. In the case of the voter here under consideration we find from the evidence that his tax was not paid at his rquest, either verbal or written, and was not paid with his money, but was paid by a volunteer with his own money, and without any authority to make such payment; and we perceive no conflict with the opinion referred to of the First Court of Civil Appeals and ours here, holding that such payment so made by a volunteer with his own money, and not that of the voter, and without request or authority from the voter does not comply with the requirements of the Constitution to the effect that the voter shall pay his poll tax. * * *."

Reference was made to this distinction in the comparatively recent case of Fugate v. Johnston, Texas Civ. App., 251 S.W. 2d 792, 794, in which it was pointed out that the election code (specifically Article 5.11 Vernon's Texas Election Code) did not provide that payment of poll tax by one other than the voter would render such votes null and void and consequently it was necessary to allege and prove facts which would bring the case within the constitutional inhibition. "It compels a showing (in addition to proof of payment of poll tax by another) that there was no proper authority to purchase the poll tax. Linger v. Balfour, Texas Civ. App., 149 S.W. 795."

■ In determining whether or not a questioned vote should be counted, the rule generally applicable is the explicit wording of the election code itself. Election contests are legislative and not judicial proceedings, Williamson v. Lane, 52 Texas 335; State ex rel. Jennett v. Owens, 63 Texas 261; DeShazo v. Webb,

131 Texas 108, 113 S.W. 2d 519; Gonzales v. Laughlin, Texas Civ. App. 256 S.W. 2d 236, and if the remedy be expeditious and effective, it is essential that the legislative directives be adhered to strictly. Obviously, an election contest which encompasses the trial of numerous complicated and perhaps remote issues will afford no remedy at all. In an election contest, time is of the essence and the moot case is no stranger to our election experience. Love v. Wilcox, 119 Texas 256, 28 S.W. 2d 515; 70 A.L.R. 1484, Sterling v. Ferguson, 122 Texas 122, 53 S.W. 2d 753, Benavides v. Atkins, 132 Texas 1, 120 S.W. 2d 415; Oliver v. Freeland, Texas Civ. App., 74 S.W. 2d 711. Generally this jurisdiction destroying situation develops in the trial court. Polk v. Davidson, 145 Texas 200, 196 S.W. 2d 632. However the general guide,—a legislative statement that the irregular vote shall not be counted—is not an inflexible rule, Vicars v. Stokely, Texas Civ. App., 296 S.W. 2d 599, wr. ref. n.r.e., 157 Texas 182, 300 S.W. 2d 623, and the decision in Linger v. Balfour, Texas Civ. App., 149 S.W. 795 can be reconciled with other decisions relating to irregular payment of poll taxes upon the grounds stated in the opinion and recognized in Fugate v. Johnston, Texas Civ. App., 251 S.W. 2d 792.

The trial judge's findings as to the Butlers and the Craigs were as follows:

"That B. E. Butler and Mrs. B. E. Butler (Floyd Craig and Mrs. Floyd Craig) did not pay their poll tax, their poll tax having been bought by Rhodie Wheeler without their consent, nor did they pay the money or give anything of value or authorize the said Rhodie Wheeler to purchase the poll taxes, and were not legal and qualified voters of the Glenwood Common School District on April 30, 1955, the date of the election."

These findings place such voters squarely within the constitutional proscription recognized in Linger v. Balfour, Texas Civ. App., 149 S.W. 795 and were therefore properly excluded by the trial judge.

■ We are also of the opinion that the trial judge and the Court of Civil Appeals were correct in holding that Jean (Gene) Webb, Clyde Ray and wife and Roland T. Drake and wife were legal voters at the disputed election. Petitioner asserts that these voters had not resided in the Glenwood Common School District for a period of six months immediately preceding the election.

Article 6, Section 2 of the Constitution and Article 5.02 of Vernon's Texas Election Code are practically identical. The constitutional section reads as follows:

"Every person subject to none of the foregoing disqualifications who shall have attained the age of twenty-one (21) years and who shall be a citizen of the United States and who shall have resided in the State one (1) year next preceding an election and the last six (6) months within the *district or* county in which such person offers to vote, shall be deemed a qualified elector; * * *."

The italicized words "district or" are omitted from Article 5.02 of the Election Code.

Petitioners' assignment again raised the mooted construction of the word "district" appearing in the constitutional section. In Little v. State ex rel. Parsell, 75 Texas 616, 12 S.W. 965, this Court construed the term "district" as meaning a political subdivision embracing one or more counties and not as one referring to subdivisions of a county such as the school district here involved. This construction was discussed in Cramer v. Graham, Texas Civ. App., 264 S.W. 2d 135 wherein it was stated that "whether rightly or wrongly, it has been decided [by the Supreme Court] that the word 'district' as used in the phrase, disjunctively with the word 'county' is meaningless," and that the authorities support the rule that "an elector must be a resident of the State for one year, resident of the county for six months, and a resident of the subdivision of the county [such as a school district] wherein he votes, but not necessarily for six months." Application for writ of error was refused in the Graham case and we regard the construction of the constitutional phrase as settled. See Cramer v. Graham, supra, and authorities cited therein. This construction undoubtedly accounts for the deletion of the words "district or" from Article 5.02 of the Election Code. Under the rule above set forth the courts below were correct in holding that the five persons above mentiond were entitled to vote at the election in question although they may not have resided in the Glenwood School District for a period of six months prior to the date of the election.

■ Petitioner finally contends that the election contest should have been dismissed because the order of the County Judge calling the election was not properly supported by the petitions requesting that such election be held. The authority relied upon is Rodriguez v. Richmond, Texas Civ. App., 234 S.W. 2d 248,

wr. ref. The point urged seems to be based on the fact that the Glenwood petition sought an election to determine whether or not the Glenwood District should be consolidated with the East Mountain School District, while the petition circulated in the East Mountain District put forward the proposal that such district should be consolidated with the Glenwood District. The proposition actually submitted was in substance whether or not a majority of the legally qualified voters of each of the districts desired a consolidation of the two districts. The motion to dismiss is characterized by petitioner as being "actually a new and independent proceeding." However that may be, it seems that there is no fatal variance between the petitions presented to the County Judge and his order calling the consolidation election and therefore the trial court properly overruled the motion to dismiss.

The foregoing disposes of the points raised by the petitioner. Insofar as the application itself is concerned, the sustaining of the assignments contained therein relating to the votes of Mr. and Mrs. Butler and Mr. and Mrs. Craig would result in the affirmance of the trial judge's holding that the proposed consolidation failed by a vote of 90 for and 91 against the proposal. We pass to an examination of the brief of the prevailing party in the Court of Civil Appeals to determine if any of the points contained therein present a matter which would support an affirmance of the judgment of the Court of Civil Appeals.

■ The action of the trial court in counting the ballots of Mrs. Lillar Thomas, Delbert Gunn and Elbert Woodbury as votes against consolidation was vigorously assailed by respondents as appellants in the court below. The trial judge before determining whether the ballots should be cast for or against consolidation heard evidence from the voters upon the theory that the ballots themselves were ambiguous. The trial judge found:

"The the ballots of Lillar Thomas, Delbert Gunn and Elbert Woodbury, as shown by the ballots, are ambiguous, the Court being unable to ascertain from the way the ballots are marked how the voters intended to vote. That it was necessary to introduce parol testimony to determine how the voters intended to vote. It was found by the evidence that the three voters last mentioned intended to vote against consolidation. The Court further finds that Lillar Thomas marked her ballot in the manner that it was marked and that Elbert Woodbury is an aged Negro man and can hardly see and that he requested B. M. Alfred, one of the election officials and an advocate for consoli-

dation, to assist him in marking his ballot. That the said Elbert Woodbury told the election official that he wanted to vote against consolidation. That the said election official marked the said Elbert Woodbury's ballot in such manner that it cannot be ascertained from the face of the ballot how the voter intended to vote. That said action was fraudulent on the part of said election official and the Court finds from the testimony of the said Elbert Woodbury that he intended to vote against consolidation."

The trial judge also concluded as a matter of law that the ballots of the parties named "were ambiguous on their face and that it was necessary for the voters to testify to determine how they intended to vote in said election." The trial judge's rulings and conclusions were upheld by the Court of Civil Appeals.

In accordance with the provisions of Article 6.06, Vernon's Texas Election Code, the ballots used at the election had the following directions printed upon them:

"You may vote on the proposition hereby submitted by placing an X in the square beside the expression of your choice, or you may scratch or mark out one of said expressions, thus leaving the other as indicating your vote."

The ballot of Lillar Thomas shows an X in the box to the to the left of the word "For" and the word "consolidation" on the same line with the word "For" is underlined, viz:

 **FOR**

☐ **AGAINST** CONSOLIDATION

The ballot of Delbert Gunn shows an X in the box to the left of the word "For" with several markings obliterating the word "consolidation" following the word "For," viz:

You may vote on the proposition hereby sub-
mitted by placing an x in the square beside the
expression of your choice, or you may scratch or
mark out one of said expressions, thus leaving
the other as indicating your vote.

☒ **FOR** ~~CONSOLIDATION~~

☐ **AGAINST** CONSOLIDATION

The ballot of Elbert Woodbury shows an X in the box to the left of the word "Against" and approximately three lines drawn through the word "Against."

In 1951 the election laws were amended so as to allow the voter a choice of two methods in expressing his choice of candidates or (as in this case) propositions. He could either make an X opposite the name of the candidate or the proposition he favored or he could by "scratching" constructively erase the names of candidates or propositions that he did not favor and wished to vote against.

Sooner or later the question was bound to arise as to the interpretation of ballots voted one way by the use of the X in the box and another way by "scratching." Are such ballots merely ambiguous in the sense that parol testimony can be introduced to explain them, or should they be considered void as to the particular candidates or propositions involved? The ballot of Lillar Thomas hardly presents this question despite the opposite view taken by the courts below. In the box opposite the proposition "For Consolidation" there appears an X. This was a vote for consolidation. While the word "consolidation" in the phrase "For consolidation" was underlined, neither the word nor the phrase was "scratched" or marked out in accordance with the provisions of the election code or the directions contained upon the ballot. In view of the specific directions as to how a voter should make his intention known, this underlining cannot be considered as a "scratch or mark out" of the consolidation proposal. It is pointed out in American Jurisprudence that "Formerly, when voting was done in a less systematic fashion than at present, the rule that the intent of the voter was controlling was more generally adhered to. But under statutes adopting the official ballot, (as does Article 6.06 of the election code) judicial consideration is in many instances con-

fined to determining whether the marking complies with the mandatory statutory requirements." 18 Am. Jur., 310, Elections, Section 194. In Bailey v. Fly, 35 Texas Civ. App. 410, 80 S.W. 675, l.c. 677, it was held that the underlining of a name was not a constructive erasure of such name. In view of the statutory directions it cannot be said that the words "For annexation" were constructively erased from the ballot of Lillar Thomas. The ballot as marked was not ambiguous. The extrinsic evidence received and not the ballot makes the ambiguity. As parol evidence "may not be received for the purpose of showing that the intention of the voter was in any way different from what plainly appears on the face of the ballot, * * *." 18 Am. Jur. 310, Elections, Section 194; Savage v. Umphries, 118 S.W. 893, l.c. 903, and such evidence should be disregarded and the ballot of Lillar Thomas counted as a vote for consolidation.

■ The question above stated is, however, squarely presented by the ballot of Delbert Gunn which is self-contradictory. If the X in the box be given effect, then the vote is one for consolidation. If, however, the constructive erasure—lines through the word "consolidation"—be given controlling effect, the vote is one against consolidation. Although from Gunn's testimony it could be gathered that some of the marks upon the ballot were placed there by some other person, this theory was not adopted by the trial court as the basis for counting the vote as one against consolidation.[1] One of the advantages accruing to an sions is the avoidance of findings that would otherwise be implied to support the judgment. Rule 296, Texas Rules of Civil Procedure, Bostwick v. Bucklin, Texas Civ. App., 190 S.W. 2d 814, affirmed 144 Texas 375, 190 S.W. 2d 818; 4 McDonald, Texas Civil Practice 1288, Section 16.05, and express findings made by a trial judge cannot be "extended by implication to cover further independent issuable facts." 41B Texas Jur., 868, Trial—Civil Cases, Section 627.

■ The receiving of testimony from the voter as to his intention cannot be supported upon the theory adopted by the trial

---

[1] The "slippery memory" of man is perhaps illustrated by the documentary evidence and oral testimony relating to the ballot of Delbert Gunn. Gunn's ballot and its corresponding stub signed by him were received in evidence. The trial judge necessarily held that this ballot was the one actually cast by Gunn for he found that it was ambiguous and admitted parol testimony as to the voter's intention. In his deposition Gunn sought to directly contradict the ballot. He testified that instead of placing an X in the box opposite the words "For consolidation," he placed the X in the box opposite the words "Against consolidation," and that he placed no other marks on the ballot. In view of the ballot itself and its signed stub, it is apparent from the trial judge's findings that he believed Gunn was mistaken as to the box in which he placed an X.

court. Gunn's ballot was not merely ambiguous but wholly void. It would be anomalous to say that a vote which an election judge must necessarily reject could be accepted as a legal vote by a district judge trying an election contest upon the say so and perhaps afterthought of the voter who cast the defective and contradictory ballot. While it is a rule of general application that the will of the voter should prevail, the election code specifically provides the means whereby the voter shall make that intention known and one of the ways *not provided* by the code is to testify how he intended to vote—after the election is over. The books reflect repeated warnings of the dangers of this practice. In Davis v. State ex rel. Wren, 75 Texas 420, 12 S.W. 957, 960, Mr. Justice Gaines in discussing the public policy considerations relative to this procedure said:

"The declarations of the voters Albert S. Payne and Lewis Jackson, made after the election, were properly excluded. Upon this question we have no doubt. * * * Besides we think the admission of such testimony would contravene a sound public policy. It would open a door to fraud to permit a voter, who may have changed his mind as to his choice of candidates, and who may have become dissatisfied as to the declared result, to affect the determination of a contest by his declarations." The Davis case is relied upon as supporting the ruling of the trial judge in this case but it seems that the public policy considerations which would preclude one from testifying as to his own disqualifications as a voter would likewise preclude him from explaining a contradictory and meaningless ballot so as to vote after the election so to speak.[2] The facts of the Davis case dis-

---

[2]Authorities from other jurisdictions likewise point out the danger of allowing an elector to testify after the election is over as to how he intended to vote or how he would have voted had he been permitted to do so. In Young v. Deming, 9 Utah 204, 33 Pac. 818, the Supreme Court of Utah said:

"We know from common experience that those who do vote are usually unwilling that the character of their votes be made public, and that whenever there is an investigation as to the actual vote cast it is almost certain to bring about prevarication and uncertainty as to what the truth is; and while in this case before us no special reasons exist for casting reflections upon the truth of those who participated in the election, yet it is deemed unwise to lay down any rule by which the certainty and accuracy of an election may be jeopardized by the reliance upon any proof affecting such results that is not of the most clear and conclusive character.

"The temptation to actual fraud and corruption on the part of the candidates and their political supporters is never so great as when it is known precisely how many votes it will take to change the result, and men who are willing to sell their votes before election will quite as readily sell their testimony afterwards, especially as the means of detecting perjury and falsehood is not always at hand until after the wrong sought to be accomplished by it has become successful, and the honest will of the people has been thwarted."

Similarly in Pennington v. Hare, 60 Minn. 146, 62 N.W. 116, 117, it was said: "All that it would be necessary for them to do, in such a case, to decide the

closed that there was "a distinct pencil erasure of the name of Wren and a very faint pencil mark across the name of Davis." There was nothing ambiguous about the erasure of Wren's name. The uncertainty arose as to the faint mark across the name of Davis. Even so, the testimony of the voter was not received to explain the meaning of the faint mark. The proffered testimony which was excluded was that of one who had made out the ballot at the request of the voter and was to the effect that the faint line across the name of Davis was not intentionally made and that it was not intended as an erasure. The holding of the court was that "the name of Wren having been clearly erased, and the pencil mark across the name of Davis being so faint that it appeared that it may have been the result of accident, we think *the testimony of the witness who made out the ticket,* to the effect it was unintentional, should have been admitted." This is a far cry from the holding in the case before us in which a witness by direct parol evidence of his intention was allowed to breathe life and meaning into a dead and unintelligible ballot.[3]

In the Davis case Mr. Justice Gaines quoted Cooley with approval as follows:

"Mr. Cooley says: 'We think evidence of such facts as may be called the circumstances surrounding the election—such as who were the candidates; * * * if a ballot was printed imper-

---

[3]Stubbs v. Moursund, Texas Civ. App., 222 S.W. 632, may be properly described as another "faint line" case. It does illustrate an extension of the holding of Davis v. State ex rel. Wren in that the court permitted the voter himself to testify that a vertical line crossing Moursund's name was placed there through mistake that he was attempting to erase it when his erasure broke. Stubbs' name was clearly marked out by horizontal lines. This case carries the rule allowing the admission of parol testimony to explain a ballot to its permissible limit. It should not and cannot with safety be further extended. From the description of the ballots involved in both the Davis and Moursund cases it appears fairly clear from the face of the ballots, that the voters intended to vote for Davis and Moursund respectively. The inquiry then arises as to whether an election judge in ascertaining the will of the voter could not have properly counted the votes for Davis or Moursund without resort to extrinsic evidence. The two cases may be considered as holdings that parol evidence may be admitted to make certain that which is strongly indicated by the ballots themselves. Neither is authority for the proposition that a ballot may be contradicted by parol evidence.

---

election, would be to declare that they intended to vote for a particular candidate. It would enable them to sell the office to the candidate offering the highest price for it, because they would not be called upon for their declaration until a contest arose, afer the actual ballots had been counted, and the precise effect of their statement known. They could swear falsely as to their past intentions, without fear of punishment, for how would it be possible to disprove their statement as to their intentions with reference to a supposed act, if perchance they had acted? Cooley, Const. Lim. 781. * * *.'"

fectly, how it came to be so printed, and the like—is admissible for the purpose of showing that an imperfect ballot was meant for a particular candidate, unless the name is so different that to thus apply it would be to contradict the ballot itself, or unless the ballot is so defective that it fails to show any intention whatever, in which cases it is not admissible. *And we also think that in any case to allow a voter to testify, by way of explanation of a ballot otherwise fatally defective, that he voted the particular ballot and intended it for a particular candidate is exceedingly dangerous, invites corruption and fraud, and ought not to be suffered.*' Cooley on Const. Lim., 768; see also McCrary on Elec., Secs. 407, 411."

McCrary in his treatment of "imperfect ballots" quotes at length from the Congressional contest of McKenzie v. Braxton wherein it was held that testimony that votes cast for "E. M. Braxton," for "Elliott M. Braxton" for "Elliott Braxton" and for "Braxton" should be counted for the candidate for Congress with the surname Braxton as he was variously known throughout the district as E. M. Braxton, Elliott Braxton, etc. This case is illustrative of the type of ambiguity and uncertainties which may be dispelled by parol evidence. However, the report specifically states that "It is true that no evidence aliunde can be received to contradict the ballot, *nor to give it meaning where it expresses no meaning of itself,* but, if it be ambiguous or of doubtful import, *the circumstances* surrounding the election may be given in evidence to explain it. The passage from Cooley appearing in the report of Davis v. State ex rel. Wren is then appellant through a request for express findings and conclu- quoted with approval wherein it is stated that parol evidence cannot be received in aid of a ballot that "is so defetive that it fails to show any intention whatever." McCrary on Elections (3rd Ed.) Section 493 et seq.

This distinction between an ambiguous ballot and one that is void is further reiterated by McCrary in Section 507 as follows:

"Section 507. While it is true that evidence *aliunde* may be received to explain an imperfect or ambiguous ballot, it does not by any means follow that such evidence may be received to give to a ballot a meaning or effect hostile to what it expresses on its face. The intention of the voter can not be proven to contradict the ballot, or when it is opposed to the paper ballot which he has deposited in the ballot box. Thus when a ballot is cast which has upon it the names of two persons for the same

office, proof offered to show that the voter intended to vote for the one or the other of them, and not for both, must be rejected. Such a ballot may be void, but it is not ambiguous, and therefore can not be helped by a parol proof."

In American Jurisprudence it is likewise pointed out that extrinsic evidence cannot be received to explain the voter's intention "when the ballot is too defective to express any intention whatever." 18 Am. Jur., 310, Elections, Section 194.

Because of the considerations discussed in the authorities above mentioned, it is not the policy of the law to permit elections to be determined by self-contradictory or meaningless ballots plus parol testimony. The ballot of Delbert Gunn was void and should not be counted either for or against the consolidation proposal. Cf. Article 8.16, Vernon's Texas Election Code; McFarlane v. Westley, Texas Civ. App. 186 S.W. 261, wr. dism.; Huff v. Duffield, Texas Civ. App., 251 S.W. 298; Murray v. Waite, 113 Me. 485, 94 Atl. 943, Ann. Cas. 1918A, 1128; Fitzsimmons v. Wilks, 25 Cal. App. 56, 142 Pac. 892.

■ While the trial judge in his finding treated the ballots of Lillar Thomas and Elbert Woodbury in one paragraph as "ambiguous" ballots, it is readily apparent that the ballot of Elbert Woodbury stands in a different category from the others. While it is presumed that election officials have acted in a legal manner and performed their duty, Savage v. Umphries, 118 S.W. 893, the trial judge made a direct finding contrary to the presumption and to the effect that an election official and proponent of consolidation fraudulently marked Woodbury's ballot so as to make it impossible to ascertain how he intended to vote. When it is determined by the trier of facts on sufficient evidence that a ballot has been fraudulently marked by another or that a spurious ballot has been substituted for that of the voter, the rule is that the voter may state how he intended to vote. Such testimony while recognized as a potential source of danger, is nevertheless accepted as a matter of necessity to prevent greater evils that would surely result from its exclusion. In Savage v. Umphries, Texas Civ. App., 118 S.W. 893, 1.c. 903, it was said:

"A voter cannot be allowed to testify that he voted one way, when he admits that he cast a ballot, which has not since been changed, showing that he voted another way. But testimony of voters that they voted for a certain candidate or measure, and that the ballots purported to have been cast by them have been substituted for, or changed from, those actually cast, is admis-

sible; for, where it is contended that a fraudulent substitution has been made, the elector may be asked for whom or for what measure he voted. In election contests, as in all other cases, the rule, excluding parol evidence to contradict, vary, or modify written instruments, is much relaxed when fraud is alleged. 15 Cyc. 419, 420. 'Stuffing ballot boxes,' or the fraudulent substitution of different votes from those actually cast at an election can rarely, if ever, be shown by the testimony of those who perpetrated the fraud, and must, almost of necessity, be proved by circumstances, or by the parol testimony of the voters themselves as to what candidates or measure they actually cast their vote for at the election. * * * If such evidence is false, it is easier to procure the evidence of the perjury than it would be to procure evidence of the fraudulent substitution of ballots for those actually voted at the election."

There was no error in the trial court's ruling as to the vote of Elbert Woodbury. Owens v. State ex rel. Jennett, 64 Texas 500; Hutson v. Miller, 148 Miss. 783, 114 So. 820; Kreitz v. Behrensmeyer, 125 Ill. 141, 17 N.E. 232, 8 Am. St. Rep. 349; Laleman v. Bredesen, 377 Ill. 342, 36 N.E. 2d 727, 29 C.J.S. 399, Elections, Section 278.

The vote of Lillar Thomas should be deducted from the number of votes cast against consolidation and counted as a vote for consolidation. The vote of Delbert Gunn should also be deducted from the number of votes cast against consolidation as this ballot was self-contradictory and void. The election count would then be 91 votes for consolidation and 89 votes against consolidation. This would result in an affirmance of the judgment of the Court of Civil Appeals and it is accordingly so ordered.

Judgment of the Court of Civil Appeals affirmed.

Opinion delivered May 15, 1957.

MR. JUSTICE GARWOOD, joined by JUSTICE GRIFFIN, concurring.

Pursuant to our practice of submitting proposed opinions (in rotation) prior to actual decision of the case, I submitted one in this instance, reaching the same conclusion we now reach on the point on which we granted the writ of error, but approaching it from a somewhat different angle. That point was the one involving the holding of Linger v. Balfour, Texas Civ.

App., 149 S.W. 795, 807, to the effect that where the voter's poll tax has been paid by another without previous authority, the corresponding vote is void. As to the point of the respondent seeking to uphold the decision of the Court of Civil Appeals on the theory that certain "ambiguous" ballots were wrongfully counted by the trial court as votes against the consolidation, I reached a conclusion contrary to that now reached by the Court. This latter conclusion I still believe to be at least just as sound as that now adopted by the Court, although obviously there are good arguments both ways. But, as to the point on which the writ was granted, I have concluded, after further thought and considering the Court's opinion, that probably I was wrong about that point and the Court is also wrong.

On this poll tax matter, my original theory was that, although neither the Constitution nor the Election Code declares the vote to be void or the voter to be disqualified, yet neither do they so declare in express terms with regard to a vote cast by one whose poll tax has not been paid at all, and since, in the latter situation it is held that the vote is void (Ramsay v. Wilhelm, Texas Civ. App., 52 S.W. 2d 757, 761), wr. of er. refused, there is no general obstacle to our inferring that votes are void even though no express constitutional or statutory provision so states. Thus I felt free to reason further that where the statutes make it a crime for a third party to procure and pay for the poll tax of a voter, it would at least be somewhat paradoxical to count the corresponding vote, and that accordingly it should *not* be counted. I did not reason, however, as the Court now seems to do, and as the Court of Civil Appeals did in Linger v. Balfour, supra, that in some unspecified manner the Constitution, and it alone, compels the conclusion that the vote is void. I could not and did not say that the instant case (and Linger v. Balfour) may be distinguished from cases upholding the validity of votes, such as Wallis v. Williams, 50 Texas Civ. App. 623, 110 S.W. 785, on the ground that in the former the Constitution is what controls the matter, as distinguished from the statutes.

The latter reasoning appears logically indefensible. The constitutional provision in question (Art. VI, Sec. 2) may, indeed, be construed as requiring the voter to furnish the money for his own poll tax, although it is not nearly as specific to this effect as are the statutes (see Chap. 5 of the Election Code, particularly Art. 5.11; also the many corresponding penal provisions, such as Arts. 199, 201, 203 and 204, Vernon's Texas P. C.). But in such a situation, or even one in which the only statutory pro-

vision were identical with that of the Constitution, we do not reason that the vote is void only because the Constitution, as distinguished from the statutes, says what it does. If there were some question of the power of the Legislature in the premises, the constitutional provision *as such* would be important, but no such question is here involved. The question before us is whether we shall draw a judicial inference that a vote is void, where neither the Constitution nor statutes say it is in so many words. How can we say that only the Constitution justifies that inference, and that the statutes do not, when the statutes not only contain a provision identical with the constitional provision in question (see Sec. 5.02, Election Code) but also the above-mentioned additional provisions which come much nearer justifying the inference than does the rather vague constitutional provision? Certainly if the statutes specifically stated that such votes should not be counted, while the Constitution said only what it now says, we would attribute the void character of the vote to the statutes and not to the Constitution alone.

Thus I did and do believe that we cannot set the instant case and Linger v. Balfour apart, and say that in them the votes were void "under the Constitution," but that all other cases of irregularity in the payment of poll taxes are "statutory cases' and thus entitled to a contrary result. Unless the same language means one thing when used in a constitution but something different when used in a statute, the absence of a provision nullifying the votes in question is just as important to the validity of the votes in the one case as in the other. If we cannot infer invalidity from the statutes, we cannot infer it from identical and even vaguer language in the Constitution. If we are to say that votes based on irregular poll tax payments are valid unless an express provision of law declares them invalid, what difference can it make that the irregularity exists in one case by reason of a statute and in another case by reason of both the Constitution and a stattute? The opinion in Linger v. Balfour does, of course, purport to rest itself on the Constitution, but to that extent it is erroneous, even should the result be justifiable on other grounds.

The fact is, that we adopt the fallacious "constitutional" distinction largely in order to invalidate the ballots here involved, yet at the same time not cast doubt on several decisions of the Courts of Civil Appeals, such as Wallis v. Williams, supra (see also Fugate v. Johnston, 251 S.W. 2d 792) in which certain poll tax payment irregularities are held not to affect the cor-

responding votes. Now there may be some actual distinction between such cases and the instant one in that here the wrongful act of the third party in paying the poll taxes in question with his own money and without any sort of authority from the voters in question was a more serious type of irregularity, pointing, as it does, somewhat more directly than other irregularities might, toward a purpose of the third party to suborn votes. But the Constitution does not create that or any distinction, and if the latter exists at all, it is rather vague. On the other hand, I share what seems to be the agreed view, evidenced by Wallis v. Williams, that not every irregularity involving the payment of poll taxes of voters by third parties should invalidate ballots. Also one must recognize considerable force in the general thesis—stated in quite broad and emphatic terms in Fugate v. Johnston, supra, and Warren v. Robinson, Texas Civ. App., 32 S.W. 2d 871, 872—that where the third party assists in the procurement of the voter's poll tax receipt and thereby violates a statute, the vote itself should not be avoided unless the statute declares that it should be. There is also the obvious possibility that the persistent failure of the Legislature to make such a declaration evidences its preference for enforcing the state policy against third parties assisting voters in the matter of their poll taxes through the penal laws (above cited) which, incidentally, are directed against the third parties rather than against the voter himself.

All this being true, and the present question being an entirely open one, so far as this Court is concerned, I have now concluded that the better answer is simply to overrule Linger v. Balfour and thus establish a uniform rule in cases of this general type to the effect that the vote in question shall be counted, notwithstanding that the third party who procured or assisted in procuring the voter's tax certificate may have been guilty of a crime in so doing. Often enough the voter himself will be entirely innocent in the matter or will actually vote his own convictions in any event. I do not think it can be said with any certitude, in the face of existing penal provisions, that upholding the votes in question will significantly increase irregular practices, still less foster an unhealthy state of mind on the part of voters generally.

In no event, can I see any compelling motive, theoretical or practical, to resort to arbitrary distinctions between cases like the instant case and Linger v. Balfour, supra, on the one hand, and, on the other, cases involving other kinds of irregularities in the payment of poll taxes. If decisions such as Wallis v.

Williams, supra, are correct; if the Court's "constitutional" distinction between such decisions is unsound, as I consider it to be; if there is no other distinction that is satisfactory, as I believe there is not; and if there is no compelling reason to uphold Linger v. Balfour, supra, which I think there is not, our logical course seems to be to overrule the latter decision, sustain the holding of the Court of Civil Appeals that the four votes here in question were valid, and uphold its judgment on that ground.

Opinion delivered May 15, 1957.

Rehearing overruled June 19, 1957.