## DEL RIO INDEPENDENT SCHOOL DISTRICT OF VAL VERDE COUNTY, Texas, et al., Appellants,

v.

### Cristobal P. ALDRETE et al., Appellees.

### No. 14449.

Court of Civil Appeals of Texas.

San Antonio.

Dec. 15, 1965.

Rehearing Denied Jan. 19, 1966.

598

Dobbins & Howard, San Antonio, W. S. Nixon, Del Rio, for appellants.

Montague & Thurmond, Del Rio, Hart Johnson, Fort Stockton, for appellees.

PER CURIAM.

This is a contest of an election to consolidate Common School District No. 5 of Val Verde County, hereinafter referred to as C. S. D. #5, with the Del Rio Independent School District, hereinafter referred to as Ind. S. D. The proposition carried in Ind. S. D. by a vote of 565 to 43, but was defeated in C. S. D. # 5 by a vote of 113 to 83. This contest was duly filed by certain trustees of Ind. S. D. and some residents of C. S. D. # 5, who favored consolidation. A lengthy non-jury trial was had wherein challenges were asserted against a substantial number of voters in C. S. D. #5 by both contestants and contestees. Judgment was entered in favor of contestees declaring the true vote in C. S. D. #5 as 50 votes "For Consolidation" and 71 votes "Against Consolidation" and decreeing that the proposed consolidation failed to carry by a majority of 21 votes.

Contestants complain on this appeal of the trial court's action relative to 76 ballots, and their complaints are divided into three general classifications. 1. Twenty-six voters who favored consolidation were found to be non-residents of C. S. D. #5 and their votes disqualified, after the trial court located the common boundary line between C. S. D. #5 and Ind. S. D. 2. It is asserted that the trial court erroneously overruled contestants' challenges based on the residence of twenty-nine voters who voted against consolidation. 3. Contestants also complain of the trial court's refusal to hold invalid twenty-one absentee ballots because of alleged irregularities in the conduct of the absentee election. By cross-assignments, contestees assert that the trial court erred in holding that twelve voters who had voted against consolidation were non-residents of C. S. D. #5.

The common boundary line between Ind. S. D. and C. S. D. #5, which is in controversy, was defined by the County School Board in 1949 as the north line of Survey No. 6 and the south line of Survey No. 8, Block 4, I & GN RR Co. Survey. All of

Survey No. 6 was placed in Ind. S. D. and all of No. 8 was placed in C. S. D. #5. The boundary line was not located on the ground at this time. The controlling question concerning the legality of these twenty-six voters found by the trial court to be non-residents is whether the trial court was authorized in this proceeding to locate the boundary line between these districts in accordance with a boundary line located on the ground by a survey made subsequent to this election, or was bound by the well-recognized boundary line before and at the time of the election.

The undisputed evidence shows that in 1951 Mr. Conger Jones, a registered land surveyor, had located a boundary line on the ground which was uniformly recognized for all purposes at the time of this election, as the common boundary line between the two districts. Mr. J. A. Conklin, a licensed land surveyor and public surveyor, was employed by the contestees shortly after this election contest was filed to verify the Jones line and to establish the correct line. These two surveyors testified fully at the trial as to the location on the ground of the common boundary line as established by each surveyor. The trial judge found that the true line was that established by Conklin. Twenty-six voters, otherwise qualified, who had cast votes "For Consolidation" lived north of the line established by Jones, but south of the line established by Conklin, and their votes were declared illegal by the trial court and not counted in the judgment.

In November, 1951, Jones was employed by the owners of the part of Survey No. 8 and the northern part of Survey No. 6, where the disputed voters now reside, to survey No. 8 on the ground in connection with a proposed sale. In doing so he was required to locate on the ground the common boundary line between these two surveys. In 1953 a plat containing his field notes and the boundary line located by him was filed in the Surveyor's Map Records of Val Verde County. Although Surveys No. 6 and No. 8 are in the center of a tier of

four surveys in Block 4, Jones surveyed only No. 8. He discovered an apparent excess acreage of 43.9 acres in Survey No. 8. His field notes were filed with the General Land Office, and on December 10, 1954, the Commissioner issued a deed of acquittance in according with the Jones "corrected field notes" whereby the 683.9 acres of land contained in Survey No. 8, as described by metes and bounds in said deed, were acquitted to the original grantee.

The primary reason for the survey work was in furtherance of plans to subdivide the area for residential purposes. On May 24, 1955, a plat of the Frank Newton Subdivision was filed with the City Secretary and Mayor of Del Rio. On June 12, 1956, a map of the Buena Vista Subdivision was approved and filed in the New Map Records of the City. On June 27, 1956, a plat of the Buena Vista Subdivision was filed with the Val Verde County Clerk. Each of these plats was prepared by Jones and shows the common boundary line of Surveys No. 6 and No. 8 in the area in question to be forty-six feet north of and parallel with the north line of Stricklen Avenue.

The trial court found that as homes were built in the Buena Vista Subdivision and such improved properties were assessed for taxation, the Tax Collector for Ind. S. D. and the County Tax Collector (who was assessing and collecting the taxes for C. S.D. # 5) in assessing and collecting school taxes for the respective school districts, used the boundary line as shown by the Jones plats as the common line and they assessed and collected taxes on this basis.

The trial court further found that the census takers, acting under instructions of the County School Superintendent of Val Verde County, used the boundary line as shown on said plats in making the scholastic census, and that the County School Superintendent returned such census reports to the State Board of Education in accordance with this boundary line. Transfer fees were paid consistently after 1958 on the children who lived north of such boundary

line but attended schools in Ind. S. D. (The twenty-six disqualified voters had paid transfer fees on their children sent to school in Ind. S. D.)

It was further found that the Commissioners' Court of Val Verde County from and after the time the Jones plats were filed had approved the tax rolls which showed the land north of this boundary line as being subject to C. S. D. #5 school taxes. The County Judge in approving the petition seeking the consolidation election and in determining that the petition was signed by the requisite number of residents of C. S. D. # 5, recognized the boundary line as established by the Jones plats. All twenty-six voters, including the presiding judge, of one of the C. S. D. #5 voting precincts were issued poll tax receipts and were on the poll lists as residents of Survey No. 8.

Mr. Conklin testified that when he checked the field notes of Jones he found they were erroneous and not based upon any markers contained in the original patent to Block 4, which was an office survey. Conklin found an excess in the entire tier of four surveys, and, after prorating this excess equally among the four surveys, he established the common boundary line 276 feet north of the line established by Jones.

It is our opinion that where the location of a boundary line is not certain, the residence of the voters should be determined in accordance with the recognized line. Such a rule is set forth in 29 C.J.S. Elections § 54. Lovewell v. Bowen, 75 Ark. 452, 88 S.W. 570 (1905), and Smith v. Combs, 310 Ky. 755, 221 S.W.2d 672, Ky. Ct. of App., are cited in support of this rule. See also Nunnelly v. Doty, 210 Ky. 642, 276 S.W. 152, Ky.Ct. of App; Stice v. Parsley, 217 Ky. 716, 290 S.W. 471, Ky.Ct. of App.

In Harrison v. Jay, 153 Tex. 460, 271 S. W.2d 388 (1954), the Supreme Court, in answer to a certified question, held that Art. 2.06 of the Election Code, V.A.T.S., by its very terms requires that a voter must cast his vote in the voting precinct where he resides. In *Harrison* the precinct lines had been in existence for many years and the challenged voters were found to have voted in other precincts because it was more convenient to vote there, because of their desire to vote in that particular precinct, or because of their failure to acquaint themselves with the precinct lines. The Supreme Court recognized that a different rule applies where the Commissioners' Court had, through inadvertence or uncertainty as to the election precinct lines, designated the polling place outside the legal boundaries.

In Tondre v. Hensley, Tex.Civ.App., 223 S.W.2d 671, no writ history, this Court recognized the distinction between a case where a voter, through inadvertence or mistake, votes in the wrong precinct and a case where the boundary line of the precinct is uncertain. The Court said: "However, it is a different matter when contiguous or near at hand voting precincts are involved and the poll taxpayer is mistaken as to the location of precinct lines and this confusion is also shared by the tax assessor-collector, the issuing authority for poll tax receipts. Voters should not be disqualified where uncertainty exists both in the minds of the tax assessor-collector and the voter as to where a precinct line runs." In Ralls v. Parish, Tex.Civ.App., 151 S.W. 1089, no writ history, the Court refused to disfranchise votes cast at a polling place located in a disputed area between counties, although it was actually found to be in the second county. The Court said: "It would be a harsh rule that would disfranchise a whole community because of an honest mistake or because surveyors could not agree as to the true line."

In our case all officials concerned with the boundary line, from 1953 to the time of this trial, recognized the Jones line as the common boundary. In fact,

there is no evidence of any uncertainty about this line prior to this election. Assuming that the Conklin line is actually correct, a statutory election contest is not the proper proceeding for establishing a new boundary line. To do so could only result in havoc because of the impossible burden it would place on the voter and the resulting uncertainty it would create. It is settled that such an action is a legislative and not a judicial proceeding. Duncan v. Willis, 157 Tex. 316, 302 S.W.2d 627 (1957). The court had no jurisdiction in this proceeding to determine matters which did not pertain strictly to this election. Harrison v. Jay, supra.

■ The boundary line to be recognized in this election contest is the line which had been recognized by custom and usage, and according to which taxes were assessed and paid, the residence of scholastics established and tuition paid, rather than a new boundary line located by a survey made subsequent to the election, which had never before been used and recognized by the school authorities. Especially is this true where there are no markers which would make the new line certain.

The trial court erred in disqualifying the votes of the twenty-six residents of the area north of the recognized Jones line. These twenty-six votes cast "For Consolidation" are sufficient to carry the proposed consolidation in C. S. D. #5, by a vote of 76 votes "For Consolidation" and 71 votes "Against Consolidation." Contestants' other complaints are immaterial unless contestees' cross-assignments change this result.

Contestees urge by cross-assignments that the trial court erred in sustaining contestants' challenges to twelve voters who had voted "Against Consolidation" after finding that they were not residents of C. S. D. #5 at the time of the election. Contestants in their pleadings challenged seventy-seven voters as being non-residents. Testimony was heard as to each challenged voter and,

at the conclusion of the four-week trial, findings of fact were filed concerning each voter. Based on these findings the trial court concluded that forty of the challenged voters who had voted in C. S. D. #5 "Against Consolidation" did not reside in that district at the time of the election and that their votes are void. Contestees complain of the trial court's action in declaring twelve of these votes void. (Contestants assert error in the trial court's failure to disqualify the votes of twenty-nine other persons who voted "Against Consolidation.")

C. S. D. #5 comprises about 885 square miles and contains many large ranches. Most of the voters challenged owned or leased ranches in this area. Many also owned homes in Del Rio where their children attended the public schools as residents of Ind. S. D. However, during summers, week-ends and on holidays, the families stayed at the ranches. Many had secured their poll tax receipts in previous years as residents of precincts within Ind. S. D. After this consolidation election was called, over fifty voters transferred their poll tax receipts from a precinct within Ind. S. D. to C. S. D. #5. All testified they intended for their residence to be in C. S. D. #5.

Contestees complain of the disqualification of L. E. Davis, Therrell Rose and wife, Lewellen, Hussie Galloway, Sparks Rust and wife, Yvonne, F. M. Harrison and wife, Marilee, Carroll R. Pusard and wife, Joy, and Bob Gurley and wife, Dorothy.

Mr. L. E. (Linn) Davis did not testify, but his granddaughter's husband, Mr. Jack Brown, testified that Davis had moved to Del Rio on doctor's orders, after having a series of strokes. Davis had an exemption certificate issued from a Del Rio precinct and he voted there in the 1964 general election. This certificate was changed to the ranch location on December 21, 1964. His ranch house is now occupied by Brown's family. Mr. and Mrs. Brown's votes were

challenged, but they were found to be residents of this ranch house.

Therrell Rose testified that he and his wife have owned and occupied a home in Del Rio for twenty-five years and that both of his sons attended Ind. S. D. as residents of the district. He has served as trustee for Ind. S. D., and voted in primary and general elections in 1964 as a resident of a precinct in Ind. S. D. During the years of their marriage, Mr. and Mrs. Rose have voted sometimes at the ranch and sometimes in Del Rio.

Mr. Hussie Galloway testified that he owned a ranch in C. S. D. # 5, but since January, 1963, has lived with his wife in a Del Rio apartment house. His wife has taught school in Ind. S. D. since 1957. He has to live in Del Rio because of stomach ulcers. In 1964 he voted in Del Rio at a precinct in Ind. S. D. Mrs. Galloway did not change her poll tax receipt to C. S. D. #5.

Sparks Rust, Jr., and his wife have owned a home in Del Rio since 1961 and rented there before buying their home. They have three children who are attending school in Ind. S. D. as residents. The poll tax receipts for Rust and his wife show the Del Rio address and he voted there in 1964. His wife teaches school in Ind. S. D. and they belong to a church there. Rust owns no other land, but his father leases a ranch in C. S. D. # 5, and he is foreman for his father. There is a house on this ranch which is occupied by Rust and his family when the children are not in school.

Mr. Felix M. Harrison and wife, Marilee, have lived in a house owned by them in Ind. S. D. since he suffered a heart attack in 1958. He also owns a ranch in C. S. D. #5. Although he spends practically all his nights at the town house, Mr. Harrison has always voted in C. S. D. # 5, and at the present time is a county school trustee from this district. He has no plans to move back to the ranch.

Both Carroll R. Pusard and his wife, Joy, testified in this case. The family has owned a homestead in Del Rio since 1960, and their daughter attends school in Ind. S. D. as a resident. Mr. Pusard served as a school trustee of Ind. S. D. from 1953–1957, and has voted in a precinct within Ind. S. D. since 1953. His 1963 poll tax receipt was from that precinct until it was transferred after this consolidation election was scheduled. He and his wife own no property in C. S. D. # 5, but he manages a ranch in that district, owned by his father-in-law, Mr. F. M. Harrison, and the family spend the summers there. He served as election judge of one of the precincts in C. S. D. #5 at the consolidation election.

Bob Gurley testified that his wife owned a house in Del Rio and that he and his wife have a daughter who attends schools in Ind. S. D., as a resident. The trial court found that they spent most of their nights just before December, 1964, in the Del Rio house. Mrs. Gurley has an interest in the Gillis Ranch where they also have a home. Mr. Gurley voted in the Del Rio City Election, and in a precinct within the Ind. S. D., for the last ten years. He was a precinct chairman until he resigned on December 9, 1964, and changed his residence to the Gillis Ranch.

Art. 5.08 of the Election Code, V.A.T.S., defines the "residence" of a single man as where he usually sleeps at night; that of a married man as where his wife resides, or if he be permanently separated from his wife, his residence is where he sleeps at night. All the above voters, with the exception of Davis, were married and none were permanently separated.

In Mills v. Bartlett, 377 S.W.2d 636 (Tex. 1964), the Supreme Court recently considered the question of "residence". It was there said: "The term 'residence' is an elastic one and is extremely difficult to define. The meaning that must be given to it depends upon the circumstances surround-

ing the person involved and largely depends upon the present intention of the individual. Volition, intention and action are all elements to be considered in determining where a person resides and such elements are equally pertinent in denoting the permanent residence or domicile." The Court further held that residence cannot be determined solely by intention.

Other cases have emphasized the rule that the question of residence for voting purposes is one which must be determined by reference to the actual facts and circumstances; one of which will be the intention. See Cavallin v. Ivey, Tex.Civ.App., 359 S.W.2d 910, no wr.hist.; Jordan v. Overstreet, Tex.Civ.App., 352 S.W.2d 296, no wr. hist.; Cramer v. Graham, Tex.Civ.App., 264 S.W.2d 135, wr.ref.; McBride v. Cantu, Tex.Civ.App., 143 S.W.2d 126, no wr.hist.; 36 Tex.Jur.2d, Elections, § 36.

▇ It is our opinion from a review of the findings of the trial court relative to these twelve voters found to be non-residents, as well as the evidence upon which same are based, that the trial court did not abuse its discretion in finding that each of these voter's intention to be a resident of C. S. D. #5 at the time of this election, was overcome by other evidence. This evidence includes poll tax receipts, declaration on school census, prior votes in Ind. S. D. precincts, and other acts which occurred prior to this expressed intention. There was no evidence that any of these voters had moved or taken any action in support of a change of intention after the above acts occurred. There is evidence to support the judgment of the trial court with respect to these twelve voters and this Court is bound by the trial court's findings. We therefore overrule contestees' cross-assignments.

The judgment of the trial court is reversed and judgment here rendered declaring the consolidation election to be carried in C. S. D. #5 by a vote of 76 votes "For Consolidation" to 71 votes "Against Consolidation."